**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO**

In re:

THE PHOENIX FUND LLC

Debtor

Case No. 26-00712 (ESL)

Chapter 11

**AMENDED[1] MOTION FOR ENTRY OF ORDER TO CONTINUE OCIF'S
ENFORCEMENT ACTION OR, IN THE ALTERNATIVE
FOR RELIEF FROM THE AUTOMATIC STAY**

TO THE HONORABLE ENRIQUE S. LAMOUTTE
UNITED STATES BANKRUPTCY JUDGE:

**COMES NOW** the Office of the Commissioner of Financial Institutions of Puerto Rico

("OCIF"), in connection with its *Amended Complaint And Order Of (I) Cease And Desist, (II)*

*Liquidation Of Private Equity Fund And (III) Interim And Permanent Appointment Of Receiver*

*To Carry Out The Liquidation* dated February 18, 2026 (the "Complaint and Receivership Order"),

through the undersigned counsel, and respectfully submits this *Motion For Entry of an Order to*

*Continue OCIF's Enforcement Action Or, In The Alternative For Relief From The Automatic Stay*

(the "Motion"). In support of the Motion, the OCIF respectfully states and prays as follows:

**PRELIMINARY STATEMENT**

OCIF respectfully requests that this Court enter an order allowing for the continuation of

the Enforcement Action (defined below) relating to the Complaint and Receivership Order, as the

automatic stay provisions of Section 362(a) do not apply to bar or stay OCIF's regulatory and

police powers against The Phoenix Fund LLC (the "Debtor" or the "Fund").  In the alternative, in

the event the Court understands that the automatic stay does apply, then OCIF requests relief from

---

[1] OCIF is hereby filing this Amended Motion as, with the original filing, the undersigned inadvertently filed a prior
version thereof that did not include all the changes in this final version of the motion. OCIF requests that the Court
and parties in interest refer to this Amended Motion for the allegations and relief requested herein.

the automatic stay, for the reasons set forth below.

OCIF is the entity charged under Puerto Rico law to oversee, supervise, and regulate private equity funds such as the Debtor[2], among other financial entities. The Debtor's business generally involves raising capital from investors to pursue investments. As part of OCIF's regulatory duties, OCIF has attempted to conduct an examination of the Debtor's financial condition for over a year and has not been able to complete it as a result of the Debtor's numerous defaults and actions

More specifically, during January 2025, OCIF exercised its police and regulatory powers by attempting to conduct a routine examination of the Debtor. While OCIF could not conclude its exam because the Debtor failed to provide all the documents and information that OCIF requested, its preliminary findings revealed then that Debtor had defaulted for years in its reporting obligations to its investors and to OCIF, despite the clear reporting requirements of the Incentive Code and Regulation No. 9461. As a result of those findings and the Debtor's failure to provide the necessary documents to complete the exam, the OCIF took further regulatory actions and in June 2025 filed the Original Complaint and Order (defined below) with the purpose of conducting a special examination of the Debtor. The Original Complaint and Order then led to the issuance of the Consent Order (defined below), whereby the OCIF ordered, with the Debtor's consent, a special examination (the "Special Examination"), to be conducted by Driven, P.S.C. as appointed receiver ("Driven" or the "Receiver"). As detailed below, the Debtor again failed to comply with its duties under the Consent Order and, thus, the OCIF was not able to complete the Special

---

[2] The Debtor is a private equity fund created pursuant to Act No. 185 of November 12, 2014, as amended, known as the *Private Equity Fund Law* ("Act 185-2014"), with a Tax Exemption Decree effective as of December 30, 2022, pursuant to Act No. 60 of June 1, 2019, as amended, known as the *Puerto Rico Incentives Code* ("Act 60-2019" or the "Incentives Code") and regulated by Regulation No. 9461 of May 15, 2023, known as the *Regulation for the Supervision of Private Equity Funds* ("Regulation No. 9461"). By virtue of such statutes, the Fund is subject to the OCIF's regulatory oversight and authority.

Examination. However, while the OCIF was unable to conclude the Special Examination, the preliminary findings thereof revealed that Debtor was in a critical financial condition: the Debtor had limited to no liquidity, was unable to pay claims in the ordinary course including claims of creditors, operating expenses, and wages, and was reporting annual losses in the tens of millions of dollars. Furthermore, Debtor continued to fail to comply with its basic reporting requirements to investors and OCIF and had not issued audited financial statements since 2022.

These ongoing defaults–and others detailed below–led OCIF to, in an exercise of its police and regulatory powers, be forced to institute a proceeding to name an interim and permanent Receiver for such entity. OCIF issued an order naming Driven as its interim receiver and the hearing in the Enforcement Action (defined below) to make such appointment permanent was scheduled for February 26, 2026.  The Debtor initiated this bankruptcy case in an attempt to avoid such hearing and to attempt to prevent OCIF from exercising its regulatory powers.[3]

The actions taken by OCIF are powers granted to OCIF based on Puerto Rico law as part of its mandate to supervise, regulate, and oversee Puerto Rico's financial system.  These regulatory acts are not subject to the automatic stay, as they constitute an exercise of the Government's - through OCIF's- regulatory and police powers. While OCIF understands that the proceedings pending before the agency Administrative Forum (defined below) is not subject to the automatic stay–for the reasons detailed below– out of an abundance of caution, OCIF seeks entry of an order allowing the Enforcement Action to proceed and, in the alternative, to lift the automatic stay (in the event it were to apply) for that purpose.

Ample case law supports OCIF's request. Among these, recently the United States District

---

[3] See "Resolution of the Manager of The Phoenix Fund LLC Authorizing the Filing of a Petition for Reorganization under Chapter 11 of the Bankruptcy Code", Docket No. 1., pg. 13 (stating that the reason for filing was OCIF placing the Debtor "in receivership and liquidation" and undertaking "steps to obtain possession of the Company's assets").

Court for the District of Puerto Rico, through Honorable Judge Laura Taylor Swain ("Judge Swain"), considered the exception to the automatic stay for police and regulatory powers pursuant Section 362(b)(4) and found that the government agency's actions therein were not subject to the automatic stay; a conclusion that fits squarely with the request made here. Further, courts throughout the United States have considered proceedings where the government entity is exercising its regulatory powers to name a receiver and have allowed such regulatory government entity to continue its proceeding and for the appointed receiver to continue its functions. For the reasons detailed below, OCIF requests similar treatment here, for the Court to allow it to continue its regulatory functions and continue the Enforcement Action and for the proceedings to run its course and determine whether the Receiver should be appointed on a permanent basis.

To provide context to OCIF's requests to the Court today, OCIF is also filing, contemporaneously to this motion, an emergency motion to name the Receiver as "debtor-in-possession". As detailed in such emergency request, the Receiver was appointed, on an interim basis, pre-petition as part of OCIF's regulatory functions and such appointment vested in the Receiver "all of the Debtor's corporate powers" and, from issuing such appointment, the Receiver was the Debtor's "member or managing member". See Complaint and Receiver Order, pg. 35, Section A (1). As such, OCIF requests that the Court appoint the Receiver as the "debtor-in-possession", as already existed on an interim basis prior to the Petition Date, and that the Court allow the Enforcement Action to conclude and determine if the Receiver should be appointed on a permanent basis. Accordingly, OCIF requests resolution of this Motion on an expedited basis, as resolution of the Enforcement Action on an expedited basis is not only required under Puerto Rico law (requiring the hearing to be conducted within ten (10) days from the entry of the Complaint and Receiver Order), but also critical for the determination that the Receiver is the debtor-in-

possession on a permanent basis.

Accordingly, for these reasons and those detailed below, OCIF requests that the Court enter an order in its favor pursuant to 11 U.S.C. §362(j) or, in the alternative, that the Court lifts the stay (to the extent it applies) in favor of OCIF for the conclusion of the Enforcement Action before the Administrative Forum pursuant to 11 U.S.C. §362(d)(1).

## JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(G). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The relief requested in this Motion is predicated on 11 U.S.C. §§362(a) and (d), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### A. The Enforcement Action and Receivership[4]

#### i. The Original Complaint and Order

1. On January 27, 2025, OCIF began a regular examination of the Debtor. See, **Exhibit 1** Paragraphs 4-24.

2. OCIF was not able to complete the examination of the Debtor because it did not receive all of the information and documents requested from the Debtor, despite numerous requests and follow-up communications from OCIF. See, **Exhibit 1**, Paragraphs 4-24.

3. Even though OCIF did not complete its exam and could not assess the Debtor's financial condition then, OCIF found that the Debtor had failed to comply with numerous financial

---

[4] OCIF provides background on the Debtor's actions and defaults to provide context to this Court. Nonetheless, OCIF submits that the appropriate forum to decide the Enforcement Action is the Administrative Forum as provided under applicable law.

and other reporting requirements to its investors and to OCIF as required by Act 185-2014 and Act

60-2019, including the failure to provide audited financial statements for the years 2023 and 2024.

See, **Exhibit 1**, Paragraphs 25-29.

4.       As a result of these and other breaches, on June 16, 2025, OCIF issued a *Complaint*

*and Order of (I) Cease and Desist*, *(II) Appointment of a Receiver, and* (III) *Imposition of*

*Administrative Fine* issued on June 16, 2025 (the "Original Complaint and Order"), thus

commencing an administrative enforcement proceeding under Case No. C25-V-001 (the

"Enforcement Action"), before the administrative forum of the OCIF (the "Administrative

Forum").

5.       Through the Original Complaint and Order, OCIF appointed Driven as Receiver to

conduct a special examination (the "Special Examination") of the Debtor.  See **Exhibit 2** (Consent

Order).

6.       After several procedural events, OCIF, with the Fund's consent, issued a *Consent*

*Order* (the "Consent Order") dated June 25, 2025.

7.       Through the Consent Order, Driven (now the Receiver) was appointed to conduct

the Special Examination on the Fund. Further, through the Consent Order, the Fund agreed to

provide access, documents, and information to Driven and to satisfy in full the costs of such Special

Examination. See, **Exhibit 2**.

### ii.   *The Consent Order and the Fund's failure to comply*

8.       Specifically, pursuant to the Consent Order, the Fund was required to comply with,

among other things, the following obligations:

> a.   "[C]ooperate fully and diligently with the Examiner, and provide full access to all information, documents, books, records, computers and all data systems of TPF and all Affiliated, Related and Subsidiary Entities, including, but not limited to those listed on pages 3 and 4 of the Complaint and Order (collectively,

the 'Affiliated Entities'), that the Examiner requires, in the form, format, and within the term that the Examiner himself determines." See **Exhibit 1**, p. 2.

b. Notify "the Fund's investors of the results of its operations by delivering unaudited quarterly reports, in accordance with the applicable legal and regulatory provisions, and certify this compliance to OCIF through certifications and compelling evidence." Id., p. 3.

c. Submit "to OCIF the unaudited quarterly financial reports and when they would submit the audited statements that are still pending, within a term of thirty (30) days counting from the notification of this Consent Order, together with all the supporting documentation required by Regulation No. 9461." Id.

d. Cooperate "fully with OCIF, the Examiner, and with any third party that the Examiner designates for the conduct of the special examination aimed at safeguarding The Phoenix Fund's compliance with the legal and regulatory requirements applicable in this jurisdiction. It is clarified that, given the operational structure of The Phoenix Fund, full cooperation by the Fund for the conduct of the special examination will involve providing access to and visibility over documents, contracts, and data of the Affiliated Entities." Id. pp. 3-4.

e. In addition, the Consent Order stated as follows:

   i. That "[a]ny document or communication that is under the control or possession of the Fund and that is requested by the Examiner shall be delivered to the Examiner on or before forty-eight (48) hours of its request, or in any other period at the discretion of the Examiner" and

   ii. "The reasonable expenses incurred in the examination, including the compensation of the Examiner and the professionals he hires, would be paid by the Fund and must be incorporated into its operating budget. For this, the Examiner will prepare a budget of the reasonable expenses of the examination, and The Phoenix Fund will present to the Examiner and OCIF, within (10) days of receiving said budget, the manner and form in which The Phoenix Fund will pay these expenses, for OCIF's approval." Id. p. 2.

9.      Finally, under the Consent Order, the duration of the Special Examination was not to exceed the term of six (6) months. Id. p. 3.

10.     To commence the Special Examination, on June 28, 2025, Driven sent its first information request to the Debtor.  See **Exhibit 1**, Paragraphs 31-52.

11.     However, almost immediately after sending such first request, the Fund began again to challenge the scope of the Special Examination, refusing to provide information about the

7

Affiliated Entities (as defined in the Consent Order) and, in particular about The Phoenix Fund Advisor LLC and the entities related to Pariter Securities and its subsidiaries. See **Exhibit 1**, Paragraphs 31-52.

12. To attempt to resolve this issue, OCIF and/or the Receiver held multiple exchanges with the Fund aimed at trying to minimize controversies so that the Special Examination could be carried out. See **Exhibit 1**, Paragraphs 31-52.

13. However, OCIF continued to observe several breaches of the Consent Order by the Fund, including, but not limited to, lack of real cooperation to carry out the Special Examination, and failure to cover the costs thereof. See **Exhibit 1**, Paragraphs 31-52.

14. Thus, on July 10, 2025, OCIF sent the Fund a notice of breach of the Consent Order, detailing the aforementioned points and ordering the Fund to fully comply with all points described therein on or before July 14, 2025. See, **Exhibit 3**.

15. Despite the above, the Fund continued to repeatedly breach its obligations under the Consent Order, resulting in OCIF sending a second and third notices of breach, dated August 1, 2025, and September 5, 2025, respectively. See, **Exhibits 4** and **5**.

16. In an effort to attempt to continue the Special Examination, notwithstanding the Fund's serial breaches of the Consent Order, on December 9, 2025, Driven sent another request for documents and information to the Fund, giving it until December 30, 2025, as the deadline to respond to it. See **Exhibit 1**, Paragraphs 31-52.

17. Although the Fund responded to the request and provided answers to Driven's questions and provided certain documents, the information provided by the Fund was simply insufficient to conclude the Special Examination because it lacked critical data to evaluate the

8

financial situation of each of the investments as provided in the Consent Order.  See **Exhibit 1**, Paragraphs 31-52.

18.     Further, and critically, the Fund breached the requirement to pay the funds required for the Special Examination, as set forth in the Consent Order, and only paid a fraction of the agreed-to amounts.  See **Exhibit 1**, Paragraphs 31-52.

19.     As a result of the Fund's serial breaches of the Consent Order, the Fund prevented OCIF, yet again, from conducting an examination of the Fund, and more so within the six-month period contemplated under the Consent Order.  See **Exhibit 1**, Paragraphs 31-52.

20.     While OCIF was not able to conclude the Special Examination, the limited information provided to Driven and the preliminary findings made through such information revealed that the Fund was in a dire financial situation.  OCIF notes that it did not conclude the Special Examination, it was not able to conduct a valuation of the Debtor's assets, nor the other tasks set forth in the Consent Order.  Thus, OCIF's preliminary findings are based on the Debtor's own numbers, public information, or information provided by the Debtor's creditors.  Nonetheless, these preliminary findings reveal the following.

21.     **Nominal to No Liquidity**.  The Fund has nominal to no liquidity and has been unable to pay regular operating expenses such as payroll and wages.  Based on the Fund's own data submitted to the Receiver, such data shows that the Fund: (a) maintained nominal cash balances in its operational accounts ($5,596.00 for March 2025 and $3,127.00 for April of the same year); (b) has been unable to pay payroll and wages for months, resulting in the resignation of key personnel; (c) has been unable to pay the costs of the Special Examination, even though the Fund specifically agreed to do so pursuant to the Consent Order; and (d) has accrued substantial accounts payables.  See e.g., **Exhibit 1**, Paragraphs 52, pages 15-16 of Complaint and Receiver Order.

22.     **Substantial Losses**.  Based on the documents provided by the Fund to the Receiver, the Fund reported net operating losses of $30.9 million and $17.8 million in its 2023 and 2024 tax returns and has accumulated losses of $100 million combined between 2021-2024, coupled with combined net unrealized investment losses in 2021-2024 (2023 not provided) of over $100 million. The Fund did not provide such information for 2023. See e.g., **Exhibit 1**, Paragraphs 52, pages 15-16 of Complaint and Receiver Order.

23.     **Lack of Financial Data and Disclosures.**  The Fund has not issued audited financial statements for the year 2022, 2023 and 2024, as required under applicable law, and has not reported financial data to its investors and to OCIF, as required under applicable law.  See **Exhibit 1**, Paragraphs 25-29, pages 15-16 of Complaint and Receiver Order.

24.     **Failure to Pay Claims in the Ordinary Course**.  The Fund has been unable to pay its creditors or claims in the ordinary course, accumulating substantial litigation claims, judgments, and attachments.  As of June 2025, the Fund had several litigation claims asserting over $45 million in due amounts; of these, three creditors had already pre-judgment attachments in excess of $29 million.  See **Exhibit 1**, Paragraph 30. Most recently, the Puerto Rico State Insurance Fund filed a complaint against the Fund, seeking a judgment in the amount of approximately $99.5 million and asserting that the Fund had not paid amounts due to the State Insurance Fund for years.

25.     **Raising Capital Contributions**.  The Fund alleges, based on documents submitted to the Receiver, that it raised $47 million in capital contributions during 2024, yet it is unclear if these contributions were used to satisfy operating or other expenses in light of the substantial operating losses reported.

26.     **Outdated and Likely Overstated Asset Valuations**.  According to the Fund's records, the Fund has invested in thirty entities. According to the Fund's own numbers, the

10

combined total cost of the Fund's investments was $372,000,000.00, for which the Fund reported a combined market value of approximately $494,000,000.00 as of March 31, 2025.[5]

    a. Of this value, three (3) investments—which represent 54% of the total value of the thirty (30) entities—are related to High Trend International LLC (an investment in Brazil);

    b. Of the total market value, 92% is concentrated in eight (8) investments, including the three (3) from High Trend International LLC;

27. Of those thirty (30) entities, as of the date of Driven's preliminary analysis, the Fund itself assigned a value of $0 for thirteen (13).

28. Nonetheless, the Fund's pre-petition negotiations on some of these investments reveal that for such investments, the Fund's valuation was substantially overstated. For example, the Fund was in negotiations to sell—for the amount of $2,100,000.00—its equity participation in Blue Sky Group, LLC, valued by The Phoenix Fund on its books at $32,400,000.00. Similarly, PUC Holdings LLC (subsidiary for which The Phoenix Fund owns all the equity participation) was in negotiations to sell its participation in VSC Group LLC (VSC). In 2024, the Fund's management turned down a $40,000,000 offer for its VSC equity participation. Subsequently, the Fund was negotiating the sale of VSC for the amount of $18,300,000.00 but was unable to close the transaction and ultimately transferred its interest in VSC to its former owner at no value. This final transaction which would have resulted in a reduction in the value assigned by the Fund on its books of $20,000,000.00 of PUC Holdings.

29. The two transactions described above would have resulted in reducing by approximately **$52,400,000.00** the value reported by the Fund from $494,000,000.00 to **$441,600,000.00**. It appears likely that the Debtor's own valuations are substantially overstated and its insolvency risk substantially higher.

---

[5] The Phoenix Fund did not provide valuation information to Driven or OCIF dated after March 31, 2025.

30.     **<u>Outdated or Likely Understated Liability Numbers</u>**.  According to the Fund's numbers, it represented to OCIF that it owed creditors likely substantially less than due.  For example, the Fund reported in its documents to the Receiver that it had claims to creditors of approximately $319 Million among the Fund and its affiliates (who have not filed for bankruptcy relief). As part of such disclosures, for example, the Fund reported that it owed to Brevet and affiliated entities approximately $120 Million, yet Brevet advised the Receiver that it was owed in excess of $396 Million. Similarly, the Fund had in its books an obligation to the State Insurance Fund of $80 Million; yet the State Insurance Fund asserts in its complaint that the amounts due exceed $99.5 Million.  Further, the Debtor's numbers of amounts due to creditor did not consider trade and operating payables, which have accrued substantially.  Accordingly, it is likely that the Debtor's liability and claims analysis is substantially understated, and its insolvency risk substantially higher.

31.     **<u>New Numbers in Bankruptcy Filing</u>**.  Despite the foregoing, with its bankruptcy petition, the Fund irreconcilably represented having estimated assets of $500,000,000.00 to $1,000,000,000.00 and estimated liabilities of $100,000,001.00 to $500,000,000.00. <u>See</u>, Docket No. 1, pp. 3-4, *Items* 15 and 16. This contradicts the Fund's own numbers and likely has no valuations to support such asset values.  To the extent that the Fund now alleges or argues that the above-stated values are incorrect, because these amounts were taken from the Fund's own provided data, either the values provided by the Fund to OCIF were knowingly incorrect, or a material, albeit clearly undisclosed change of circumstances– despite the requirements under the Consent Order– occurred.

### iii. *The Complaint and Receivership Order*

32.     In light of the fact that OCIF was not able to complete its Special Examination as a result of the Debtor's failure to comply with the Consent Order, and as a result of the Debtor's breaches of its reporting and other requirements and financial condition, on February 18, 2026, OCIF issued the Complaint and Receiver Order against the Fund, **(i)** ordering the Fund, pursuant to Article 10(a)(10)(A) of Act 4-1985 (the "OCIF Enabling Act"), to cease and desist from taking any new investments, **(ii)** ordering the liquidation of the Fund pursuant to Section 2044.03(g)(2)(iv) of the Incentive Code and Article 13 of Regulation No. 9461, **(iii)** directing the Fund to fully cooperate with the Receiver for the taking of possession of the Fund's assets and the commencement and culmination of any investigation required to be carried out for the orderly liquidation of the Fund and **(iv)** appointing Driven– on an interim basis pending the outcome of a hearing scheduled for February 26, 2026– as Receiver pursuant to Article 10(b) for the implementation of the liquidation ordered pursuant to Section 2044.03(g)(2)(iv) of the Incentive Code. See, **Exhibit 1**, pp. 34-35.

33.     Moreover, through the Complaint and Receiver Order, pursuant to the above-cited statutes, OCIF decreed that the Receiver **(i)** would immediately be conferred all faculties and authorities previously held by the Fund's members, directors, managers or authorized persons to act on behalf of the Fund, to take immediate control of the Fund's assets, books and records and, *inter alia*, **(ii)** would act as exclusive administrative member and liquidator of the Fund with the authority to, among other things, the possibility of filing voluntary petitions under section 11 of the United States code (the "Bankruptcy Code") and to act as debtor-in-possession in such proceeding. Id. at p. 36.

13

34. Furthermore, through the Complaint and Receiver Order, the Fund was explicitly ordered to take all necessary safety measures to assure, guarantee, preserve and maintain in integral form all documents and assets of the Fund and its affiliated entities, including documents, reports, books, records, and accounting records, among others.

35. Following the issuance of the Complaint and Receivership Order, the Receiver appeared, with a representative of the OCIF, at the Fund's premises, to personally serve the same.

36. The Fund, by way of Mr. Héctor Martínez López ("Mr. Martínez"), who identified himself as operation staff, received a physical copy of the Complaint and Receivership Order, which was further served by email communication to the Fund's then officers and directors and their legal counsel. See, **Exhibit 3**.

37. Mr. Martínez indicated that there were no physical or paper documents of the Fund in their premises, alleging that all books and records were stored in a "cloud-based" storage system and (because the Fund's premises were, in effect, almost entirely vacant) that all staff of the Fund operated remotely. Id.

38. Furthermore, prior to the Petition Date, the Receiver obtained no possession of any physical assets of the Fund (whose representatives alleged that the Fund had no assets).

39. The Receiver was not granted any information about any bank accounts of the Debtor containing any evidence of substantial funds or assets.

40. On February 19, 2026, the Receiver was ultimately only granted access (after several failed attempts) to the Fund's cloud-based system.

41. However, between late in the evening of February 22, 2026 and the morning of February 23, 2026, the Receiver's informational technology staff became aware that personnel of the Fund was removing and/or deleting data and files from the cloud-based system, and, to preserve

14

the same, the Receiver revoked access to the cloud-based system to all personnel of the Fund. The Receiver subsequently provided access once the Fund filed this petition for relief, pending a resolution of this Motion. Nonetheless, this underscores further the need for the Enforcement Action to continue and run its course.

42.     OCIF's position, summarized above, and the Debtor's response, if any, needs to be adjudicated as part of the Enforcement Action in the Administrative Forum, as provided for under Puerto Rico law. OCIF requests that the Court allow such Enforcement Action to continue and conclude.

## REQUEST FOR ENTRY OF ORDER AND BASIS THEREFOR

One of the main tenets of the Bankruptcy Code is the protection afforded by the automatic stay under 11 U.S.C. § 362. The automatic stay is a form of injunctive relief that:

> provides for a broad stay of litigation, lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims. It also stays a wide range of actions that would affect or interfere with property of the estate, property of the debtor or property in the custody of the estate.

3-362 Collier on Bankruptcy P. 362.01; Velasquez v. Hanes PR, Inc. (In re Velasquez), 2010 Bankr. LEXIS 2448, 4-5 (Bankr. D.P.R. 2010).

The protection of the automatic stay under Section 362(a) is very broad in scope. However, the same is not unlimited.

### A. Section 362(b)(4): Police Power and Regulatory Exception.

Although the scope of the automatic stay is broad, to address the concern that it could be potentially used to interfere with competing policy goals, "Congress has adopted important limits and exceptions to the stay, including the police power exception." In re Ruiz, 122 F.4th 1, 11 (1st Cir. 2024). Specifically, section 362(b)(4) excepts from the stay "the commencement or continuation of an action or proceeding by a governmental unit… to enforce such governmental

unit's… police and regulatory power, including the enforcement of a judgment other than a money judgment." 11 U.S.C. § 362(b)(4). As recently held by Honorable Judge Swain "**the police powers protected under § 362(b)(4) are not limited to matters directly involving public health and safety**" and that "[c]ase law recognizes that section 362(b)(4) **"extend[s] more broadly to regulatory efforts to protect public <u>welfare</u>."** <u>In re Fin. Oversight & Mgmt. Bd. for Puerto Rico</u>, No. 17 BK 3283-LTS, 2025 WL 3078311, at *5 (D.P.R. Oct. 27, 2025). (emphasis in original). This exception discourages debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers and/or consumer protection regulations. <u>In re Montalvo</u>, 537 B.R. 128, 142 (Bankr. D.P.R. 2015) (Lamoutte, B.J.) (citing <u>McMullen v. Sevigny (In re McMullen)</u>, 386 F.3d 320, 324–325 (1st Cir.2004)[6].

This exception ensures that government agencies can still enforce laws "affecting health, welfare, morals and safety" and that debtors are not automatically protected in bankruptcy court from such regulatory laws. <u>In re Ruiz</u>, 122 F.4th 1, 13 (1st Cir. 2024). "Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay". <u>See</u>, H.R. Rep. 95-595, 343, 1978 U.S.C.C.A.N. 5963, 6299.

---

[6] In determining whether a particular governmental action is exempted from the automatic stay pursuant to section 362(b)(4), the court does not have to pass judgment (review/analyze/question/scrutinize) the legitimacy of any pending administrative procedures because this would conflict "with the broad discretion Congress has expressly granted many administrative entities and because it is inconsistent with the limited authority Congress has vested in bankruptcy courts." <u>In re Montalvo</u>, 537 B.R. 128, 144 (Bankr. D.P.R. 2015).

Notably, the Court of Appeals for the First Circuit (the "First Circuit") held that, under its statutory text, "[t]he police power exception applies by its terms to the commencement or continuation of such an action, but also extends to "the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power." Id. Indeed, the First Circuit has recognized that an interest as remote from safety as a regulator's **"interest in ensuring that the milk being produced can meet the demands of the consumer market"** is within the scope of section 362(b)(4). In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, No. 17 BK 3283-LTS, 2025 WL 3078311, at *5 (D.P.R. Oct. 27, 2025) (citing Ruiz, 122 F.4th at 14).

The First Circuit has further stated that "[w]hile the statutory language is our touchstone, we have recognized that, in applying the police power exception, "courts have devised two interrelated, fact-dominated inquiries — the so-called 'public policy' and 'pecuniary purpose' tests ...." In re Ruiz, 122 F.4th 1, 14 (1st Cir. 2024). Moreover, in In re Ruiz, the First Circuit clarified that its statement in In re Spookyworld, Inc., 364 F.3d 1, that government enforcement actions may fall outside the scope of section 362(b)(4) if they advance **"perhaps the pecuniary interest of others"** was "obvious obiter dictum." In re Ruiz, 122 F.4th at 15. It further stated that section 362(b)(4) does not contain a **"rule to the effect that any time a government action serves any private pecuniary interest to any degree, the police power exception cannot apply."** Id. Rather, case law applying section 362(b)(4) recognizes **"that a pecuniary interest** of the government itself **cannot be the primary purpose of the government's action."** Id. at 16. In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, No. 17 BK 3283-LTS, 2025 WL 3078311, at *6 (D.P.R. Oct. 27, 2025) (emphasis in original).

Furthermore, "[w]hen a governmental unit decides to undertake an enforcement action and believes its action falls within the police power exception, it need not petition the bankruptcy court for permission to proceed in the ordinary course ...." Ruiz at *13. By doing so, however, "the agency runs the risk that a court will later find its action outside the exception's ambit" and thus in violation of the bankruptcy stay". Id. To avoid that risk, and for prudential reasons, the OCIF is hereby requesting from the Court an order pursuant to 11 U.S.C. §362(j) confirming that no stay is in place in connection with the OCIF's enforcement actions and exercise of its regulatory and police powers.

### i. The Incentive Code

Act 60-2019, known as the Puerto Rico Incentive Code, in its relevant part, states as follows in Section 2044.03(g)(2)(iv):

> OCIF shall be empowered to examine and inspect Private Equity Funds or Puerto Rico Private Equity Funds to ensure that they informed their operations and financial results accurately, comply with their fiduciary duty to their Investors, and meet the requirements of this Code. The Fund shall pay the cost prescribed by OCIF through regulations to conduct such examinations and inspections. In the event of noncompliance, **OCIF may take actions as are necessary including the liquidation of the fund and cessation of additional offerings of its securities**.

See, 13 LPRA § 45363 (g)(2)(iv) (emphasis added).

Similarly, Article 13 of Regulation No. 9461 states that, when the circumstances so merit it and it is in the best public interest, the OCIF may, in cases of noncompliance, take any measures it deems necessary, including, among other measures, the liquidation of a private equity fund and the cessation of additional offering of its securities.

### ii. The OCIF Enabling Act

In turn, the OCIF Enabling Act provides, that the Commissioner, in addition to the powers and faculties transferred hereby, shall have, among others, the following powers and authorities:

18

"When any of the laws and regulations he administers does not provide otherwise, to issue, after due notice and hearing, cease and desist orders, and prescribe the terms he determines are for the benefit of the public. When in the Commissioner's opinion said violation causes or could cause immediate grave damage to industry, the citizenry or specific persons, he may issue said order of a summary nature, passing over the requirement of due notice and hearing, until the final disposition of any procedure instituted under this section."

See, 7 LPRA §2010(a)(10).

and

"If as a result of an audit, examination or inspection, or of a report submitted by an examiner, it is shown that a financial institution lacks a solid financial and economic status or that it is operated or administered in such a way that the general public or persons and entities that have funds or shares in its custody are in danger of being defrauded, and in absence of a specific provision in the law to regulate the financial institution in question and which likewise empowers it, the Commissioner may assume the direction and administration of the financial institution, and promptly appoint a trustee who, in the case of insured financial institutions can be its insuring entity. The Commissioner shall hold a hearing before issuing an order to place a financial institution under his/her direction, or that of a trustee. Nevertheless, the Commissioner may issue a provisional order appointing a receiver without having to hold a hearing, when in his/her judgment, the financial institution's status is of such a nature that it is causing or may cause irreparable damage to its interests, or those of the persons and entities with funds or assets in the institution. When the Commissioner issues a provisional order to appoint a receiver, he/she shall notify the Governor of the details and grounds for his/her determination and shall hold an administrative hearing within ten (10) days following the date of notice thereof, in order to determine if it is made permanent or revoked. The receiver thus appointed shall administer the financial institution pursuant to the provisions of the law and the regulations that govern said institution, and in accordance with the regulations that govern said institution, and in accordance with the regulations promulgated by the Commissioner for receiverships or emergency measures declared under this section. Said receivership shall terminate upon the total liquidation of the financial institution, if it were necessary, or when the operations thereof, as certified by the trustee in the Commissioner's judgment, allow the return of the administration of the institution to the duly elected and appointed officers and officials, under the circumstances stipulated by the Commissioner. The Commissioner shall fix a reasonable compensation for the services rendered by the receiver and his/her employees. The determination of the Commissioner to assume the administration and direction of a financial institution or to appoint a receiver, can be reviewed by the Circuit Court of Appeals, through a petition filed within the term of ten (10) days from the date of the determination."

See, 7 LPRA §2010(b).

Here, as stated above, the OCIF was forced to intervene with the Fund by way of the Original Complaint and Order following the Fund's clear lack of compliance with its obligations under the Incentive Code, and the lack of cooperation to provide critical data for the OCIF to be able to

19

culminate its routine exam. Following such intervention, the OCIF–through the Consent Order– provided the Fund another opportunity to become compliant with its reporting requirements, and to finalize a Special Examination to assure that the Fund was in compliance with other provisions of the Incentive Code. Despite the expedited nature that the Special Examination was to have (in that it had to be completed within six months of the Consent Order), eight (8) months after the issuance of the Consent Order, OCIF was unable to complete it after encountering the same lack of cooperation and transparency that the OCIF originally encountered.

Notwithstanding the above, with the limited information that the OCIF did receive, the regulator encountered an overall situation that was even worse than anticipated. Thus, faced with these circumstances, and with a private equity fund that has failed to provide audited financial statements for the year 2022 onward (despite the requirement therefor under Section 2044.03(g)(2)(i) of the Incentive Code[7]), the state agency regulator was left with no choice but to order the liquidation of the Fund to prevent further irreparable damage and harm to investors and creditors, and to attempt to safeguard to the public welfare of the Puerto Rico financial system. This is, in fact, the main purpose of the OCIF's existence[8].

Based on the above, and because the sole purpose of the Complaint and Receivership Order and the Enforcement Action is exercise OCIF's police and regulatory powers under applicable

---

[7] Such section states that "[e]very Fund shall: Inform its investors of its operating results quarterly (unaudited) and **annually as audited by a Certified Public Accountants firm duly licensed in Puerto Rico in order for the Investor to verify that the Fund is operating in accordance with the policies, practices, and agreements established during its organization**. The audited annual report shall include: the calculated Internal Rate of Return (IRR), an Itemization of Commissions and Expenses of the Partnership, a Summary of Capital Calls, a Debt Summary, and a Letter from the Managing Partner to the Investors." <u>See</u>, 13 LPRA § 45363(g)(2)(i). (emphasis added).

[8] The Financial Institutions Commissioner's Office shall be charged with the main responsibility of controlling and supervising the financial institutions that operate or do business in the Commonwealth of Puerto Rico, among its other functions provided in this act. **The Office of the Commissioner of Financial Institutions shall be deemed as an agency of public law and order**. <u>See</u>, Section 3 of the OCIF Enabling Act. 7 LPRA §2003. (emphasis added).

20

state law, and, further, because the Complaint and Receivership Order's purpose is not to seek any pecuniary interest whatsoever (not even by way of penalties and fines), much less the primary purpose, the automatic stay cannot apply to the Complaint and Receivership Order by virtue of 11 U.S.C. §362(b)(4). In the abundance of caution, however, to the extent that the Court deems that the stay applies to the Complaint and Receivership Order and the Enforcement Action, the OCIF hereby seeks relief therefrom for the reasons detailed herein. Furthermore, and critically, the continuation of the Enforcement Action will in no way prejudice the Fund's ability to challenge the OCIF's determination in the applicable state court forums.

**B.** **The Police Power and Regulatory Exception further applies to the appointment of the Receiver.**

As a corollary to the above, the OCIF notes that Courts have held that the prepetition appointment of a receiver by a regulator also falls within the ambit of 11 U.S.C. §362(b)(4). For example, in the case of SEC v. First Fin. Grp., 645 F.2d 429, 437 (5th Cir. 1981), the Court of Appeals for the Fifth Circuit (the "Fifth Circuit") held that the appointment of a temporary receiver as a means for the Security Exchange Commission ("SEC") to enforce its regulatory powers is excepted by the stay under 11 U.S.C. §362(b)(4). SEC v. First Fin. Grp., 645 F.2d 429, 437 (5th Cir. 1981) ("The defendant First Financial contends that the appointment of a temporary receiver is not a means by which the SEC can act to enforce its regulatory powers and, therefore, is not exempted from the automatic stay by provision of § 362(b)(4). We disagree.") (citing S.R. No. 95-989, 95th Cong., 2d Sess. 50, H.R. No. 95-595, 95th Cong., 2d Sess. 341, *reprinted in* [1978] U.S. Code Cong. & Ad. News 5787, 5836 and 6298 (governmental unit's suit against debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws is not stayed; nor is enforcement of an injunction in such cases stayed)). There, the Fifth Circuit held that– under circumstances similar to those that occurred prior to the Petition

21

Date here– post-petition actions to for the appointment of a receiver are excepted from the stay where "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought." SEC v. First Fin. Grp., 645 F.2d 429, 438 (5th Cir. 1981). Thus, the Fifth Circuit concluded, that "[i]In order to protect the public welfare--and especially the interest of those who invested with First Financial--the appointment of a receiver was a necessary relief measure within the discretion of the court, as an ancillary to preliminary injunctive relief during the continuing [**27] civil enforcement proceeding". Id[9].; see also, Securities & Exchange Comm'n v. Brennan, 230 F.3d 65, 80 (2nd Cir.2000) (Calabresi, J., dissenting) (recognizing that "where courts have feared the dissipation of assets still under a debtor's control, they have regularly countenanced governmental action to safeguard those assets during the pendency of the bankruptcy proceedings."); see also, F.T.C. v. R.A. Walker & Assocs., Inc., 37 B.R. 608, 610 (D.D.C. 1983) ("[A]ctions brought by a governmental unit to enforce such governmental unit's police or regulatory power are specifically exempt and are not stayed. 11 U.S.C. §§ 362(b)(4) & (5). Defendants admit that this proceeding is "an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power" and also concede, as they must, that the proceeding itself is not automatically stayed. Defendants maintain, nonetheless, that the district

---

[9] An examination of the legislative history of § 362, however, reveals that an "act to [**28] obtain possession" was not intended to include the judicial appointment of a receiver pursuant to a governmental unit's enforcement of its police or regulatory powers (and the transfer of possession of the violator's property to the receiver in order that he may perform his duty to maintain the status quo). Rather, the automatic stay applies to prevent dismemberment of the estate and insure its orderly distribution, S.R. No. 95-989, 95th Cong., 2d Sess. 50, H.R. No. 95-595, 95th Cong., 2d Sess. 341, *reprinted in* [1978] U.S. Code Cong. & Ad. News 5787, 5836 and 6298, in order to eliminate the impetus for a race of diligence by fast-acting creditor…The appointment of a temporary receiver, on the other hand, itself serves to prevent dismemberment of the corporate estate by management personnel who have been found to have acted fraudulently and who could otherwise easily dispose of the assets to the detriment of the debtor's creditors. See, SEC v. First Fin. Grp., 645 F.2d 429, 439 (5th Cir. 1981).

court may not freeze the debtors' assets, arguing that jurisdiction over the assets lies exclusively with the Bankruptcy Court. The case law and legislative history clearly reject this position".) see, also, S.E.C. v. Wolfson, 308 B.R. 612 (2004) (finding that Bankruptcy Code's regulatory exception to the automatic stay permitted district court to appoint a receiver in Securities and Exchange Commission's (SEC) civil fraud action against Chapter 11 debtor.); S.E.C. v. Morriss, No. 4:12-CV-80 CEJ, 2012 WL 2154903, at *2 (E.D. Mo. June 13, 2012) ("The automatic stay exception also allows the Court to appoint a receiver.")

The above reveals that 11 U.S.C. §362(b)(4) excepts from the stay not only the continued prosecution of the Complaint and Receivership Order, but also to the appointment, on a permanent basis, of the Receiver. Indeed, through a separate motion, the OCIF will seek relief from the Court in the form of an order declaring that the Receiver, by virtue of the Complaint and Receivership Order, should be the sole and exclusive managing member of the Fund as debtor-in-possession in the captioned case.

## **RESERVATION OF RIGHTS**

OCIF is filing this Motion to continue its Enforcement Action in the Administrative Forum, as provided under applicable law, and is requesting remedies to enforce its order naming the Receiver as debtor in possession. OCIF is not waiving any rights or claims, including any claims of sovereign immunity, lack of jurisdiction, or otherwise. Further, OCIF has provided background on its Enforcement Action to provide a full picture and context to the Court, without waiving OCIF's position that the appropriate forum to adjudicate the Enforcement Action is the Administrative Forum, as set forth in applicable Puerto Rico law.

**WHEREFORE**, for the reasons detailed herein, the OCIF respectfully requests that the Court enter an order pursuant to 11 U.S.C. §362(j) declaring that the stay is inapplicable to the

Complaint and Receivership Order and the continued prosecution of the Enforcement Action in the Administrative Forum, pursuant to 11 U.S.C. §362(b)(4), and that the exception of the stay further includes the appointment, on a permanent basis, of the Receiver. In the alternative, to the extent that the Court deems that the exception of the stay is inapplicable to OCIF, OCIF hereby requests relief pursuant to 11 U.S.C. §362(d)(1).

**RESPECTFULLY SUBMITTED,**

San Juan, Puerto Rico, this 25th day of February 2026.

**<u>NOTICE</u>**

Within fourteen (14) days after service as evidenced by the certification, and an additional three (3) days pursuant to Federal Rule of Bankruptcy Procedure 9006(f) if you were served by mail, any interested party whom against this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the Clerk's Office of the U.S. Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by Law; (ii) the requested relief is against public policy; or (iii) in the opinion of the Court, the interest of justice requires otherwise.

**WE HEREBY CERTIFY** that on this date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties appearing in said system, including the U.S. Trustee and that the OCIF will cause the Motion to be served in the manner required, and to the parties required to be served pursuant to L.B.R. 4001-1(c).

M P M | **MARINI PIETRANTONI MUÑIZ LLC**
*Attorneys for the Office of the Commissioner of Financial Institutions of Puerto Rico*

250 Ponce de León Ave., Suite 900
San Juan, PR 00918
Office 787.705.2171
Fax 787.936.7494

*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC-PR No. 222301
lmarini@mpmlawpr.com

*/s/ Mauricio O. Muñiz-Luciano*

Mauricio O. Muñiz-Luciano
USDC-PR No. 220914
mmuniz@mpmlawpr.com

*/s/ Ignacio J. Labarca-Morales*
Ignacio J. Labarca-Morales
USDC-PR No. 303307
ilabarca@mpmlawpr.com