**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE PHOENIX FUND LLC<br><br>Debtor | Case No. 26-00712 (ESL)<br><br>Chapter 11 |

**AMENDED[1] URGENT MOTION FOR ORDER RECOGNIZING AUTHORITY OF THE
PRE-PETITION RECEIVER, DRIVEN, P.S.C., TO ACT ON BEHALF
OF DEBTOR-IN-POSSESSION**

TO THE HONORABLE ENRIQUE S. LAMOUTTE
UNITED STATES BANKRUPTCY JUDGE:

**COMES NOW** the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCIF"), in connection with its *Amended Complaint And Order Of (I) Cease And Desist, (II) Liquidation Of Private Equity Fund And (III) Interim And Permanent Appointment Of Receiver To Carry Out The Liquidation* dated February 18, 2026 (the "Complaint and Receivership Order"), through the undersigned counsel, and respectfully submits *Urgent Motion For Order Recognizing Authority of the Pre-Petition Receiver, Driven, P.S.C., to Act on Behalf of Debtor-In-Possession* (the "Motion"). In support of the Motion, the OCIF respectfully states as follows:

**PRELIMINARY STATEMENT**

Through this Motion, the OCIF seeks, on an emergency basis, entry of an order recognizing the authority of Driven, P.S.C. ("Driven" or the "Receiver") to act as debtor-in-possession on behalf of The Phoenix Fund LLC (the "Fund" or "Debtor") in the captioned bankruptcy case.

---

[1] OCIF is hereby filing this Amended Motion as, with the original filing, the undersigned inadvertently filed a prior version thereof that did not include all the changes in this final version of the motion. OCIF requests that the Court and parties in interest refer to this Amended Motion for the allegations and relief requested herein. The changes are minimal and to correct certain statements in paragraphs 21 – 31 only.

As detailed herein, the Fund has repeatedly failed to comply with its legal and regulatory obligations under the Puerto Rico Incentive Code (the "Incentive Code") and Regulation No. 9461, including: **(i)** failure to provide audited financial statements for 2023 and 2024; **(ii)** failure to report financial data to investors and to OCIF as required by law; and **(iii)** serial breaches of a Consent Order (defined below) entered on June 25, 2025, which required the Fund to cooperate with a special examination conducted by the Receiver.

The Fund's persistent non-compliance and lack of transparency prevented OCIF from completing its examination and assessing the Fund's financial condition. Nevertheless, the limited information obtained during the Special Examination revealed that the Fund was in a critical financial situation, including: nominal to no liquidity; accumulated losses exceeding $100 million between 2021 and 2024; failure to pay operating expenses including payroll; substantial litigation claims, judgments, and attachments totaling over $45 million (with an additional $95 million claim recently asserted by the Puerto Rico State Insurance Fund); asset valuations that appear substantially overstated; and liabilities that appear substantially understated.

In light of these circumstances, on February 18, 2026, OCIF issued an *Amended Complaint And Order of (I) Cease And Desist, (II) Liquidation Of Private Equity Fund And (III) Interim And Permanent Appointment Of Receiver To Carry Out The Liquidation* (the "Complaint and Receivership Order"), ordering the liquidation of the Fund and appointing Driven as Receiver with full authority to act as exclusive administrative member and liquidator of the Fund. Pursuant to the Complaint and Receivership Order, the Receiver was expressly conferred all faculties and authorities previously held by the Fund's members, directors, managers, or authorized persons, including the specific authority to file a voluntary petition under the Bankruptcy Code (the "Code") and to act as debtor-in-possession in such proceeding.

As detailed below, applicable law supports the recognition of the Receiver's authority to act as debtor-in-possession. Under Puerto Rico law, Section 2044.03(g)(2)(iv) of the Incentive Code and Article 10(b) of the OCIF Enabling Act (Act 4-1985) authorize OCIF to order the liquidation of a private equity fund, and to appoint a receiver with authority to assume direction and administration of a financial institution when circumstances warrant. Federal bankruptcy law similarly recognizes that when a receiver is appointed as management of a debtor entity with authority to control and manage the entity's affairs, that receiver's status automatically transforms into debtor-in-possession pursuant to 11 U.S.C. § 1101(1). See In re Bayou Grp., LLC, 564 F.3d 541 (2nd Cir. 2009); S.E.C. v. Byers, 592 F. Supp. 2d 532 (S.D.N.Y. 2008).

The urgency of this Motion is underscored by the fact that, despite the foregoing, the Fund's prior management filed a petition for relief to commence the captioned case. As mentioned above, and detailed below, the Pre-Petition Receiver, Driven, and not the Fund's prior management, is the entity that was authorized to seek bankruptcy protection and to act as debtor-in-possession. Moreover, despite being ordered to cooperate fully with the Receiver and preserve all documents and assets, the Fund refused, prior to this bankruptcy filing, to turn over any assets to the Receiver. Moreover, OCIF has become aware that between February 22, 2026, and the morning of the Petition Date, personnel of the Fund were removing and/or deleting data and files from the Fund's cloud-based storage system. The OCIF therefore respectfully submits that immediate recognition of the Receiver's authority as debtor-in-possession is essential as a matter of public policy and Puerto Rico law, and to protect the interests of the Fund's investors and creditors and to preserve the estate's assets[2].

---

[2] On this same date, the OCIF is simultaneously filing a *Motion For Entry Of Order To Continue OCIF's Enforcement Action Or, In The Alternative For Relief From The Automatic Stay* (the "Motion to Continue Enforcement Action")

Finally, as context for OCIF's remedies, OCIF is filing today a motion for entry of an order to continue its Enforcement Action, detailing therein why the Enforcement Action pending before the Administrative Forum is not subject to the automatic stay.  The Enforcement Action and the Administrative Forum are the proper venues, under Puerto Rico law, to determine if the interim Receiver should be named on a permanent basis and the scope of such Receiver's powers and duties.  OCIF files this urgent request to enforce its order naming the pre-petition Receiver, on an interim basis, and to allow such Receiver to act for the debtor-in-possession, while the designation of such receiver (and, thus, its authority to act for the debtor-in-possession) on a permanent basis is decided by the Administrative Forum as part of the Enforcement Action.

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(G). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The relief requested in this Motion is predicated on 11 U.S.C. §§ 301(a), 1101(1), 1106, 1107 and Federal Rule of Bankruptcy Procedure 9001(5).

**A.  The Enforcement Action and Receivership[3]**

       ***i.  The Original Complaint and Order***

1.      On January 27, 2025, OCIF began a regular examination of the Debtor.  See, **Exhibit 1** Paragraphs 4-24.

---

detailing the reasons why the Enforcement Action pending before the Administrative Forum is not stayed pursuant to 11 U.S.C. §362(b)(4).

[3] OCIF provides background on the Debtor's actions and defaults to provide context to this Court. Nonetheless, OCIF submits that the appropriate forum to decide the Enforcement Action is the Administrative Forum as provided under applicable law.

2.      OCIF was not able to complete the examination of the Debtor because it did not receive all of the information and documents requested from the Debtor, despite numerous requests and follow-up communications from OCIF. See, **Exhibit 1**, Paragraphs 4-24.

3.      Even though OCIF did not complete its exam and could not assess the Debtor's financial condition then, OCIF found that the Debtor had failed to comply with numerous financial and other reporting requirements to its investors and to OCIF as required by Act 185-2014 and Act 60-2019, including the failure to provide audited financial statements for the years 2023 and 2024. See, **Exhibit 1**, Paragraphs 25-29.

4.      As a result of these and other breaches, on June 16, 2025, OCIF issued a *Complaint and Order of (I) Cease and Desist, (II) Appointment of a Receiver, and* (III) *Imposition of Administrative Fine* issued on June 16, 2025 (the "Original Complaint and Order"), thus commencing an administrative enforcement proceeding under Case No. C25-V-001 (the "Enforcement Action"), before the administrative forum of the OCIF (the "Administrative Forum").

5.      Through the Original Complaint and Order, OCIF appointed Driven as Receiver to conduct a special examination (the "Special Examination") of the Debtor.  See **Exhibit 2** (Consent Order).

6.      After several procedural events, OCIF, with the Fund's consent, issued a *Consent Order* (the "Consent Order") dated June 25, 2025.

7.      Through the Consent Order, Driven (now the Receiver) was appointed to conduct the Special Examination on the Fund. Further, through the Consent Order, the Fund agreed to provide access, documents, and information to Driven and to satisfy in full the costs of such Special Examination. See, **Exhibit 2**.

### *ii.  The Consent Order and the Fund's failure to comply*

8.    Specifically, pursuant to the Consent Order, the Fund was required to comply with, among other things, the following obligations:

a. "[C]ooperate fully and diligently with the Examiner, and provide full access to all information, documents, books, records, computers and all data systems of TPF and all Affiliated, Related and Subsidiary Entities, including, but not limited to those listed on pages 3 and 4 of the Complaint and Order (collectively, the 'Affiliated Entities'), that the Examiner requires, in the form, format, and within the term that the Examiner himself determines." See **Exhibit 1**, p. 2.

b. Notify "the Fund's investors of the results of its operations by delivering unaudited quarterly reports, in accordance with the applicable legal and regulatory provisions, and certify this compliance to OCIF through certifications and compelling evidence." Id., p. 3.

c. Submit "to OCIF the unaudited quarterly financial reports and when they would submit the audited statements that are still pending, within a term of thirty (30) days counting from the notification of this Consent Order, together with all the supporting documentation required by Regulation No. 9461." Id.

d. Cooperate "fully with OCIF, the Examiner, and with any third party that the Examiner designates for the conduct of the special examination aimed at safeguarding The Phoenix Fund's compliance with the legal and regulatory requirements applicable in this jurisdiction. It is clarified that, given the operational structure of The Phoenix Fund, full cooperation by the Fund for the conduct of the special examination will involve providing access to and visibility over documents, contracts, and data of the Affiliated Entities." Id. pp. 3-4.

e. In addition, the Consent Order stated as follows:

i. That "[a]ny document or communication that is under the control or possession of the Fund and that is requested by the Examiner shall be delivered to the Examiner on or before forty-eight (48) hours of its request, or in any other period at the discretion of the Examiner" and

ii. "The reasonable expenses incurred in the examination, including the compensation of the Examiner and the professionals he hires, would be paid by the Fund and must be incorporated into its operating budget. For this, the Examiner will prepare a budget of the reasonable expenses of the examination, and The Phoenix Fund will present to the Examiner and OCIF, within (10) days of receiving said budget, the manner and form in which The Phoenix Fund will pay these expenses, for OCIF's approval." Id. p. 2.

9.      Finally, under the Consent Order, the duration of the Special Examination was not to exceed the term of six (6) months. Id. p. 3.

10.     To commence the Special Examination, on June 28, 2025, Driven sent its first information request to the Debtor.  See **Exhibit 1**, Paragraphs 31-52.

11.     However, almost immediately after sending such first request, the Fund began again to challenge the scope of the Special Examination, refusing to provide information about the Affiliated Entities (as defined in the Consent Order) and, in particular about The Phoenix Fund Advisor LLC and the entities related to Pariter Securities and its subsidiaries. See **Exhibit 1**, Paragraphs 31-52.

12.     To attempt to resolve this issue, OCIF and/or the Receiver held multiple exchanges with the Fund aimed at trying to minimize controversies so that the Special Examination could be carried out.  See **Exhibit 1**, Paragraphs 31-52.

13.     However, OCIF continued to observe several breaches of the Consent Order by the Fund, including, but not limited to, lack of real cooperation to carry out the Special Examination, and failure to cover the costs thereof.  See **Exhibit 1**, Paragraphs 31-52.

14.     Thus, on July 10, 2025, OCIF sent the Fund a notice of breach of the Consent Order, detailing the aforementioned points and ordering the Fund to fully comply with all points described therein on or before July 14, 2025. See, **Exhibit 3**

15.     Despite the above, the Fund continued to repeatedly breach its obligations under the Consent Order, resulting in OCIF sending a second and third notices of breach, dated August 1, 2025, and September 5, 2025, respectively. See, **Exhibits 4** and **5**.

16.     In an effort to attempt to continue the Special Examination, notwithstanding the Fund's serial breaches of the Consent Order, on December 9, 2025, Driven sent another request

for documents and information to the Fund, giving it until December 30, 2025, as the deadline to respond to it.  See **Exhibit 1**, Paragraphs 31-52.

17.     Although the Fund responded to the request and provided answers to Driven's questions and provided certain documents, the information provided by the Fund was simply insufficient to conclude the Special Examination because it lacked critical data to evaluate the financial situation of each of the investments as provided in the Consent Order.  See **Exhibit 1**, Paragraphs 31-52.

18.     Further, and critically, the Fund breached the requirement to pay the funds required for the Special Examination, as set forth in the Consent Order, and only paid a fraction of the agreed-to amounts.  See **Exhibit 1**, Paragraphs 31-52.

19.     As a result of the Fund's serial breaches of the Consent Order, the Fund prevented OCIF, yet again, from conducting an examination of the Fund, and more so within the six-month period contemplated under the Consent Order.  See **Exhibit 1**, Paragraphs 31-52.

20.     While OCIF was not able to conclude the Special Examination, the limited information provided to Driven and the preliminary findings made through such information revealed that the Fund was in a dire financial situation.  OCIF notes that it did not conclude the Special Examination, it was not able to conduct a valuation of the Debtor's assets, nor the other tasks set forth in the Consent Order.  Thus, OCIF's preliminary findings are based on the Debtor's own numbers, public information, or information provided by the Debtor's creditors.  Nonetheless, these preliminary findings reveal the following.

21.     **Nominal to No Liquidity**.  The Fund has nominal to no liquidity and has been unable to pay regular operating expenses such as payroll and wages.  Based on the Fund's own data submitted to the Receiver, such data shows that the Fund: (a) maintained nominal cash

balances in its operational accounts ($5,596.00 for March 2025 and $3,127.00 for April of the same year); (b) has been unable to pay payroll and wages for months, resulting in the resignation of key personnel; (c) has been unable to pay the costs of the Special Examination, even though the Fund specifically agreed to do so pursuant to the Consent Order; and (d) has accrued substantial accounts payables.  See e.g., **Exhibit 1**, Paragraphs 52, pages 15-16 of Complaint and Receiver Order.

22.     **Substantial Losses**.  Based on the documents provided by the Fund to the Receiver, the Fund reported net operating losses of $30.9 million and $17.8 million in its 2023 and 2024 tax returns and has accumulated losses of $100 million combined between 2021-2024, coupled with combined net unrealized investment losses in 2021-2024 (2023 not provided) of over $100 million. The Fund did not provide such information for 2023. See e.g., **Exhibit 1**, Paragraphs 52, pages 15-16 of Complaint and Receiver Order.

23.     **Lack of Financial Data and Disclosures.**   The Fund has not issued audited financial statements for the year 2022, 2023 and 2024, as required under applicable law, and has not reported financial data to its investors and to OCIF, as required under applicable law.  See **Exhibit 1**, Paragraphs 25-29, pages 15-16 of Complaint and Receiver Order.

24.     **Failure to Pay Claims in the Ordinary Course**.  The Fund has been unable to pay its creditors or claims in the ordinary course, accumulating substantial litigation claims, judgments, and attachments.  As of June 2025, the Fund had several litigation claims asserting over $45 million in due amounts; of these, three creditors had already pre-judgment attachments in excess of $29 million.  See **Exhibit 1**, Paragraph 30. Most recently, the Puerto Rico State Insurance Fund filed a complaint against the Fund, seeking a judgment in the amount of approximately $99.5 million and asserting that the Fund had not paid amounts due to the State Insurance Fund for years.

25.     **Raising Capital Contributions**.  The Fund alleges, based on documents submitted to the Receiver, that it raised $47 million in capital contributions during 2024, yet it is unclear if these contributions were used to satisfy operating or other expenses in light of the substantial operating losses reported.

26.     **Outdated and Likely Overstated Asset Valuations**.  According to the Fund's records, the Fund has invested in thirty entities. According to the Fund's own numbers, the combined total cost of the Fund's investments was $372,000,000.00, for which the Fund reported a combined market value of approximately $494,000,000.00 as of March 31, 2025.[4]

      a.  Of this value, three (3) investments—which represent 54% of the total value of the thirty (30) entities—are related to High Trend International LLC (an investment in Brazil);

      b.  Of the total market value, 92% is concentrated in eight (8) investments, including the three (3) from High Trend International LLC;

27.     Of those thirty (30) entities, as of the date of Driven's preliminary analysis, the Fund itself assigned a value of $0 for thirteen (13).

28.     Nonetheless, the Fund's pre-petition negotiations on some of these investments reveal that for such investments, the Fund's valuation was substantially overstated.  For example, the Fund was in negotiations to sell—for the amount of $2,100,000.00—its equity participation in Blue Sky Group, LLC, valued by The Phoenix Fund on its books at $32,400,000.00.  Similarly, PUC Holdings LLC (subsidiary for which The Phoenix Fund owns all the equity participation) was in negotiations to sell its participation in VSC Group LLC (VSC). In 2024, the Fund's management turned down a $40,000,000 offer for its VSC equity participation. Subsequently, the Fund was negotiating the sale of VSC for the amount of $18,300,000.00 but was unable to close the transaction and ultimately transferred its interest in VSC to its former owner at no value. This

---

[4] The Phoenix Fund did not provide valuation information to Driven or OCIF dated after March 31, 2025.

final transaction which would have resulted in a reduction in the value assigned by the Fund on its books of $20,000,000.00 of PUC Holdings.

29.     The two transactions described above would have resulted in reducing by approximately **$52,400,000.00** the value reported by the Fund from $494,000,000.00 to **$441,600,000.00**. It appears likely that the Debtor's own valuations are substantially overstated and its insolvency risk substantially higher.

30.     **Outdated or Likely Understated Liability Numbers**. According to the Fund's numbers, it represented to OCIF that it owed creditors likely substantially less than due. For example, the Fund reported in its documents to the Receiver that it had claims to creditors of approximately $319 Million among the Fund and its affiliates (who have not filed for bankruptcy relief). As part of such disclosures, for example, the Fund reported that it owed to Brevet and affiliated entities approximately $120 Million, yet Brevet advised the Receiver that it was owed in excess of $396 Million. Similarly, the Fund had in its books an obligation to the State Insurance Fund of $80 Million; yet the State Insurance Fund asserts in its complaint that the amounts due exceed $99.5 Million. Further, the Debtor's numbers of amounts due to creditor did not consider trade and operating payables, which have accrued substantially. Accordingly, it is likely that the Debtor's liability and claims analysis is substantially understated, and its insolvency risk substantially higher.

31.     **New Numbers in Bankruptcy Filing**. Despite the foregoing, with its bankruptcy petition, the Fund irreconcilably represented having estimated assets of $500,000,000.00 to $1,000,000,000.00 and estimated liabilities of $100,000,001.00 to $500,000,000.00. See, Docket No. 1, pp. 3-4, *Items* 15 and 16. This contradicts the Fund's own numbers and likely has no valuations to support such asset values. To the extent that the Fund now alleges or argues that the

above-stated values are incorrect, because these amounts were taken from the Fund's own provided data, either the values provided by the Fund to OCIF were knowingly incorrect, or a material, albeit clearly undisclosed change of circumstances– despite the requirements under the Consent Order– occurred.

### iii.   The Complaint and Receivership Order

32.   In light of the fact that OCIF was not able to complete its Special Examination as a result of the Debtor's failure to comply with the Consent Order, and as a result of the Debtor's breaches of its reporting and other requirements and financial condition, on February 18, 2026, OCIF issued the Complaint and Receiver Order against the Fund, **(i)** ordering the Fund, pursuant to Article 10(a)(10)(A) of Act 4-1985 (the "OCIF Enabling Act"), to cease and desist from taking any new investments, **(ii)** ordering the liquidation of the Fund pursuant to Section 2044.03(g)(2)(iv) of the Incentive Code and Article 13 of Regulation No. 9461, **(iii)** directing the Fund to fully cooperate with the Receiver for the taking of possession of the Fund's assets and the commencement and culmination of any investigation required to be carried out for the orderly liquidation of the Fund and **(iv)** appointing Driven– on an interim basis pending the outcome of a hearing scheduled for February 26, 2026– as Receiver pursuant to Article 10(b) for the implementation of the liquidation ordered pursuant to Section 2044.03(g)(2)(iv) of the Incentive Code. See, **Exhibit 1**, pp. 34-35.

33.   Moreover, through the Complaint and Receiver Order, pursuant to the above-cited statutes, OCIF decreed that the Receiver **(i)** would immediately be conferred all faculties and authorities previously held by the Fund's members, directors, managers or authorized persons to act on behalf of the Fund, to take immediate control of the Fund's assets, books and records and, *inter alia*, **(ii)** would act as exclusive administrative member and liquidator of the Fund with the

authority to, among other things, the possibility of filing voluntary petitions under section 11 of the United States code (the "Bankruptcy Code") and to act as debtor-in-possession in such proceeding. Id. at p. 36.

34.     Furthermore, through the Complaint and Receiver Order, the Fund was explicitly ordered to take all necessary safety measures to assure, guarantee, preserve and maintain in integral form all documents and assets of the Fund and its affiliated entities, including documents, reports, books, records, and accounting records, among others.

35.     Following the issuance of the Complaint and Receivership Order, the Receiver appeared, with a representative of the OCIF, at the Fund's premises, to personally serve the same.

36.     The Fund, by way of Mr. Héctor Martínez López ("Mr. Martínez"), who identified himself as operation staff, received a physical copy of the Complaint and Receivership Order, which was further served by email communication to the Fund's then officers and directors and their legal counsel. See, **Exhibit 3**.

37.     Mr. Martínez indicated that there were no physical or paper documents of the Fund in their premises, alleging that all books and records were stored in a "cloud-based" storage system and (because the Fund's premises were, in effect, almost entirely vacant) that all staff of the Fund operated remotely. Id.

38.     Furthermore, prior to the Petition Date, the Receiver obtained no possession of any physical assets of the Fund (whose representatives alleged that the Fund had no assets).

39.     The Receiver was not granted any information about any bank accounts of the Debtor containing any evidence of substantial funds or assets.

40.     On February 19, 2026, the Receiver was ultimately only granted access (after several failed attempts) to the Fund's cloud-based system.

41.     However, between late in the evening of February 22, 2026 and the morning of February 23, 2026, the Receiver's informational technology staff became aware that personnel of the Fund was removing and/or deleting data and files from the cloud-based system, and, to preserve the same, the Receiver revoked access to the cloud-based system to all personnel of the Fund. The Receiver subsequently provided access once the Fund filed this petition for relief, in the abundance of caution.

## REQUEST FOR RELIEF AND BASIS THEREFOR

### A. Appointment of Pre-Petition Receiver and Authority to Act for Debtor-in-Possession.

As noted by Honorable Judge Joan N. Feeney in In re Milestone Educ. Inst., 167 B.R. 716, 720-21 (Bankr. D. Mass. 1994), "[w]hen an order appointing a receiver enjoins the directors from performing their management functions, the corporation is for all practical purposes dissolved and the receiver must perform the functions necessary to discharge his duties that the shareholders were barred from performing." Id. at *720.  Moreover, in that case, the court noted as follows:

> "[I]n In re Allen-Foster-Willett Co., 227 Mass. 551, 116 N.E. 875 (1917), the court considered a situation in which the directors of a corporation bought at a discount nearly all the debts allowed by the receivers of their company. An intervenor argued that the receivers should not pay the directors on account of the purchased claims any amount in excess of the sums they paid for the claims. In considering the directors' fiduciary duties to the corporation, the court distinguished between a voluntary dissolution of a company and the winding up of its affairs under corporate management, and the winding up of the affairs of a corporation by receivers "with authority to prosecute and defend suits, and to do all other acts which might be done by the corporation if in being, and might be necessary for the final adjustment of its unfinished business." The court noted that the company's directors, in language similar to that used by the Superior Court in the order quoted above, were not only commanded to turn over to the receivers all corporate property and effects, they were enjoined from interfering with, transferring or encumbering property of the corporation. **Under these circumstances, the court found that "this decree having ended all further corporate management the receivers alone were empowered to settle and close the company's affairs, to sell and convey its property, and to distribute the proceeds as ordered by the court.""**

See, In re Milestone Educ. Inst., 167 B.R. 716, 720 (Bankr. D. Mass. 1994) (Feeney, B.J.) (emphasis added).

In line with the above, the Court of Appeals for the Second Circuit (the "Second Circuit") in the case of In re Bayou Grp., LLC, 564 F.3d 541, 545 (2nd Cir. 2009) concluded that, by virtue of a court's appointment of a person not only as a receiver of certain entities but also as new management of the debtors with the authority and capacity to manage the bankruptcy proceedings as the debtor-in-possession, that person's status, in the face of a bankruptcy case, was transformed from "corporate governor" to debtor-in-possession pursuant to 11 U.S.C. §1101(1). Id. see also. In re Bayou Grp., L.L.C., 363 B.R. 674, 688 (S.D.N.Y. 2007), aff'd sub nom. In re Bayou Grp., LLC, 564 F.3d 541 (2nd Cir. 2009) ("Marwil is the exclusive managing member of a debtor-in-possession and is subject to all of the obligations imposed on such entities by the Bankruptcy Code, see, e.g., 11 U.S.C. §§ 345, 1107(a), 1106(a)(5), 1121(c)(1), as administered by a respected bankruptcy judge.") The Second Circuit reached this conclusion finding that the receiver (in that case, Marwil) was in the position of manager and corporate governor of the debtor, which automatically blossomed into that of debtor-in-possession because "[t]he management of a bankrupt entity that files in Chapter 11 is automatically authorized to act as the debtor-in-possession, since under the Bankruptcy Code, the term "debtor-in-possession" quite simply "means debtor."" In re Bayou Grp., L.L.C., 363 B.R. 674, 686 (S.D.N.Y. 2007), aff'd sub nom. In re Bayou Grp., LLC, 564 F.3d 541 (2nd Cir. 2009). On that same vein, Federal Rule of Bankruptcy Procedure 9001(5)(A) states that the word "Debtor", when it is not a natural person, means, any person in control.

Similarly, in the case of Securities and Exchange Commission v. Byers, 592 F. Supp. 2d 532, 539 (S.D.N.Y. 2008), the district court held that, even if a temporary receiver appointed prepetition was not expressly designated as debtor-in-possession, he would nonetheless "automatically succeed to that role by operation of the Bankruptcy Code" where the receivership order authorized

him to control and manage the entity. See, S.E.C. v. Byers, 592 F. Supp. 2d 532, 534 (S.D.N.Y. 2008), aff'd, 609 F.3d 87 (2nd Cir. 2010) ("Pursuant to the Receiver Order, the Receiver was charged with, *inter alia,* ascertaining the financial condition of the Wextrust Entities, including the extent of commingling of funds among the Wextrust Entities and the entities they control, and determining whether the Wextrust Entities and the entities under their control should file for bankruptcy")[5].

Bankruptcy Courts have followed the same reasoning with state court receiverships, even when the order appointing the receiver did not include any specific reference to it acting as debtor in possession, where such order granted the receiver the authority to "maintain, secure, manage, operate, repair and preserve the Receivership Property," and "assume control over the Receivership Property and to collect and receive all income." In re J.B. Flex, Inc., No. 12-10526, 2012 Bankr. LEXIS 616, at *1 (Bankr. S.D. Ohio Feb. 17, 2012) (citing In re Global Grounds Greenery, LLC, et al., 405 B.R. 659, 661 (Bankr.D.Ariz. 2009)).

### i.   *Puerto Rico State Law Considerations*

### a.   *The Incentive Code*

Act 60-2019, known as the Puerto Rico Incentive Code, in its relevant part, states as follows in Section 2044.03(g)(2)(iv):

> OCIF shall be empowered examine and inspect Private Equity Funds or Puerto Rico Private Equity Funds to ensure that they informed their operations and financial results accurately, comply with their fiduciary duty to their Investors, and meet the requirements of this Code. The Fund shall pay the cost prescribed by OCIF through regulations to conduct such examinations and inspections. In the event of noncompliance, **OCIF may take actions as are necessary including the liquidation of the fund and cessation of additional offerings of its securities**.

---

[5] In that case, the Receiver Order provided that: no person or entity, including any creditor or claimant against any of the Defendants, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the taking control, possession, or management of the assets, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this order. Byers.

See, 13 LPRA § 45363 (g)(2)(iv) (emphasis added).

Similarly, Article 13 of Regulation No. 9461 states that, when the circumstances so merit it and it is in the best public interest, the OCIF may, in cases of noncompliance, take any measures it deems necessary, including, among other measures, the liquidation of a private equity fund and the cessation of additional offering of its securities.

Thus, the language of Section 2044.03(g)(2)(iv) not only specifically authorizes the OCIF to liquidate the Fund in the event of noncompliance with the provisions of the Incentive Code (which should be uncontested), but also any measure it deems necessary (which, in this case, entailed the conferring to the Receiver of all authorities and faculties previously held by the Fund's management and board of directors, and the specific delegation to the Receiver of *inter alia*, the authority to act as exclusive administrative member and liquidator of the Fund).

### ii.    *The OCIF Enabling Act*

In turn, the OCIF Enabling Act provides that the Commissioner, in addition to the powers and faculties transferred hereby, shall have, among others, the following powers and authorities:

> "When any of the laws and regulations he administers does not provide otherwise, to issue, after due notice and hearing, cease and desist orders, and prescribe the terms he determines are for the benefit of the public. When in the Commissioner's opinion said violation causes or could cause immediate grave damage to industry, the citizenry or specific persons, he may issue said order of a summary nature, passing over the requirement of due notice and hearing, until the final disposition of any procedure instituted under this section. In issuing said order, the Commissioner shall promptly serve notice, as specified below, that it has been issued, and the reasons for it, and that within fifteen (15) days, counting from the receipt of a written petition the matter shall be docketed for a hearing. If no petition for a hearing is received and the Commissioner does not order it, the order shall continue in effect until it is modified or rendered ineffective by the Commissioner. If the holding of a hearing is requested or ordered, the Commissioner, after due notice thereof and allowing each person as specified below to be heard, may serve notice or render the order ineffective, or postpone it until the matter is finally disposed of."

See, 7 LPRA §2010(a)(10).

and

"When any of the laws and regulations he administers does not provide otherwise, to issue, after due notice and hearing, cease and desist orders, and prescribe the terms he determines are for the benefit of the public. When in the Commissioner's opinion said violation causes or could cause immediate grave damage to industry, the citizenry or specific persons, he may issue said order of a summary nature, passing over the requirement of due notice and hearing, until the final disposition of any procedure instituted under this section."

See, 7 LPRA §2010(a)(10)(A).

and

"If as a result of an audit, examination or inspection, or of a report submitted by an examiner, it is shown that a financial institution lacks a solid financial and economic status or that it is operated or administered in such a way that the general public or persons and entities that have funds or shares in its custody are in danger of being defrauded, and in absence of a specific provision in the law to regulate the financial institution in question and which likewise empowers it, the Commissioner may assume the direction and administration of the financial institution, and promptly appoint a trustee who, in the case of insured financial institutions can be its insuring entity. The Commissioner shall hold a hearing before issuing an order to place a financial institution under his/her direction, or that of a trustee. Nevertheless, the Commissioner may issue a provisional order appointing a receiver without having to hold a hearing, when in his/her judgment, the financial institution's status is of such a nature that it is causing or may cause irreparable damage to its interests, or those of the persons and entities with funds or assets in the institution. When the Commissioner issues a provisional order to appoint a receiver, he/she shall notify the Governor of the details and grounds for his/her determination and shall hold an administrative hearing within ten (10) days following the date of notice thereof, in order to determine if it is made permanent or revoked. The receiver thus appointed shall administer the financial institution pursuant to the provisions of the law and the regulations that govern said institution, and in accordance with the regulations that govern said institution, and in accordance with the regulations promulgated by the Commissioner for receiverships or emergency measures declared under this section. Said receivership shall terminate upon the total liquidation of the financial institution, if it were necessary, or when the operations thereof, as certified by the trustee in the Commissioner's judgment, allow the return of the administration of the institution to the duly elected and appointed officers and officials, under the circumstances stipulated by the Commissioner. The Commissioner shall fix a reasonable compensation for the services rendered by the receiver and his/her employees. The determination of the Commissioner to assume the administration and direction of a financial institution or to appoint a receiver, can be reviewed by the Circuit Court of Appeals, through a petition filed within the term of ten (10) days from the date of the determination."

See, 7 LPRA §2010(b).

and

> "The Commissioner, in addition to the powers and faculties transferred hereby, shall have the power and authority to…perform such acts as are needed for the effective achievement of the purposes of this act."

See, 7 LPRA §2010(a)(8).

In interpreting Article 10(a)(10(A) of the OCIF Enabling Act, the Puerto Rico Court of Appeals (the "State Court of Appeals") has specifically ruled as follows:

> In its Article 10, Act No. 4-1985 establishes that the Commissioner has, among others, the authority to issue cease and desist orders after notification, except where a law provides otherwise. In the event that the Commissioner believes that the referred violation causes or may cause serious immediate harm to the industry, citizenry, or a particular person, a cease and desist order may be issued summarily, passing over the requirement of notification and holding of a hearing, until the matter is finally resolved.

See, Athena Bitcoin, Inc. v. Oficina de la Comisionada de Instituciones Financieras por Zequeira Diaz, No. KLAN202200923, 2023 WL 3371314, at *17 (P.R. Cir. Apr. 10, 2023).

In turn, in interpreting Article 10(b) of the OCIF Enabling Act, the State Court of Appeals has stated that the OCIF Commissioner "has the authority to **assume the direction and administration of the financial institution** and appoint a receiver when the financial institution lacks a sound economic and financial situation". See, BASAA S.A. - DDA v. Nodus Int'l Bank, Inc., No. KLAN202500181, 2025 WL 1218282, at *9 (P.R. Cir. Mar. 25, 2025) (citing 7 LPRA sec. 2010(b)) (emphasis added). The State Court of Appeals further held as follows:

> "[I]f an audit, inspection, or examination shows that the financial institution lacks economic stability or is being managed in a manner that endangers customer funds, the Commissioner **has the authority to appoint a receiver immediately**. A hearing will not be necessary when, in their judgment, the situation is of such gravity that it is causing, or may cause, irreparable harm to the interests of the institution or to the persons and entities with funds and securities in it. In accordance with the foregoing, the receiver becomes the **administrator of the financial institution**, in accordance with the regulations in force on receiverships or emergency measures."

See, BASAA S.A. - DDA v. Nodus Int'l Bank, Inc., No. KLAN202500181, 2025 WL 1218282, at *5 (P.R. Cir. Mar. 25, 2025) (Translation ours)[6] (emphasis added).

---

[6] It is worth mentioning that the plaintiff in the case of BASAA petitioned for a writ of certiorari from the Puerto Rico Supreme Court (the "PR Supreme Court") in connection with this ruling, and the same was denied.

On that same vein, the State Court of Appeals has stated:

"[T]he Commissioner is authorized to provisionally designate a receiver to take possession of a financial institution when circumstances require it as provided by law. BHC asks us to revoke the OCIF order since, in its view, the appointment of a receiver is not appropriate under the particular circumstances of BIBTC. However, its claim is premature, given that the OCIF has not made a final determination regarding the permanence of the receivership. Note that the Commissioner's final determination to assume the administration of a financial institution or to appoint a receiver may be reviewed by the Court of Appeals, after the corresponding hearing has concluded and administrative processes have been exhausted. Until this occurs, it is appropriate for us to refrain from intervening in a controversy over which we have no jurisdiction"[7].

See, Oficina del Comisionado de Instituciones Financieras v. Bancredito Int'l Bank & Tr. Co., No. C-23-D-001, 2023 WL 2010016, at *4 (P.R. Cir. Jan. 27, 2023).

Furthermore, under Puerto Rico law, a "receivership implies the interdiction of the right of property in the broad area of management and control of properties, inasmuch as it takes that power away from the title owner and transfers it to a court or commissioner" See, Camara Comer. Mayoristas v. Trib. Superior, 102 D.P.R. 646, 2 P.R. Offic. Trans. 836, 838 (Oct. 15, 1974). Once the appointing court (or in this case, the regulatory agency) is satisfied of the need to resort to a receivership, "its action must have the purpose of setting up an integral system within which the receiver under the guidance of the court may take care in an orderly manner of the claimants who compete among themselves *to be the first to collect as thoroughbreds in a cup race." Id.

As detailed above, and by virtue of the above cited legal provisions, the OCIF's appointment of the Receiver was not limited to the mere taking of the possession of the Fund's assets, but, furthermore, that the Receiver was conferred with all authorities and faculties previously held by the Fund's management and board of directors, and the specific delegation to the Receiver of inter alia, the authority to act as exclusive administrative member and liquidator

---

[7] Moreover, as it pertains to decisions, orders and resolutions of administrative agencies, the mere filing of a petition for review "shall not stay the proceedings of the administrative agency or body, unless the court so determines." See, 3 LPRA §9676.

of the Fund with the authority to, among other things, commencing a voluntary petition under the Code and act as administrator of the debtor-in-possession in such proceeding. Under the plain language of the OCIF Enabling Act and pursuant to the authorities granted to the OCIF pursuant to the Incentive Code, the Receiver became the administrator of the Fund for any and all purposes. As concluded by the State Court of Appeals in the above cited cases, the effectiveness of the appointment of the Receiver was immediate upon the issuance of the Complaint and Receivership Order, without the necessity of a hearing[8].

For these reasons, OCIF submits that the Pre-Petition Receiver is the entity authorized to act as debtor-in-possession, on an interim basis until the Administrative Forum determines, as part of the Enforcement Action, that the Receiver should be appointed on a permanent basis.

## <u>RESERVATION OF RIGHTS</u>

OCIF is filing this Motion to request remedies to enforce its order naming the Receiver as debtor-in-possession. OCIF is not waiving any rights or claims, including any claims of sovereign immunity, lack of jurisdiction, or otherwise. Further, OCIF has provided background on its Enforcement Action to provide a full picture and context to the Court, without waiving OCIF's position that the appropriate forum to adjudicate the Enforcement Action is the Administrative Forum, as set forth in applicable Puerto Rico law.

**WHEREFORE**, for the reasons detailed herein, the OCIF respectfully requests that the Court enter an order recognizing the authority of the Pre-Petition Receiver, Driven, P.S.C., to act as debtor-in-possession in the captioned case.

---

[8] For the avoidance of doubt, and for the reasons detailed in the Motion to Continue Enforcement Action filed contemporaneously with this Motion, the OCIF contends that all proceedings pending in the Administrative Case (as defined therein), are excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 25th day of February, 2026.

## <u>CERTIFICATION OF URGENCY PURSUANT TO L.B.R. 9013-1(A)</u>

The OCIF hereby certifies that (a) it has carefully examined the matters set forth herein and has concluded that there is a true need for the granting of the relief requested herein, in an urgent basis, (b) the OCIF has not created such urgency through any lack of due diligence and; (c) has made a bona fide effort to resolve the matters without a hearing.

**WE HEREBY CERTIFY** that on this date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties appearing in said system, including the U.S. Trustee.

M P M | **MARINI PIETRANTONI MUÑIZ LLC**
*Attorneys for the Office of the Commissioner of*
*Financial Institutions of Puerto Rico*

250 Ponce de León Ave., Suite 900
San Juan, PR 00918
Office 787.705.2171
Fax 787.936.7494

*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC-PR No. 222301
lmarini@mpmlawpr.com

*/s/ Mauricio O. Muñiz-Luciano*
Mauricio O. Muñiz-Luciano
USDC-PR No. 220914
mmuniz@mpmlawpr.com

*/s/ Ignacio J. Labarca-Morales*
Ignacio J. Labarca-Morales
USDC-PR No. 303307
ilabarca@mpmlawpr.com