**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | Case No. 26-00712 (ESL) |
| THE PHOENIX FUND LLC, | Chapter 11 |
| Debtor | |

**MOTION TO ALTER OR AMEND JUDGMENT UNDER
BANKRUPTCY RULE 9023 AND/OR FOR RECONSIDERATION
UNDER BANKRUPTCY RULE 9024; AND REQUEST FOR HEARING**

**COMES NOW**, The Phoenix Fund LLC (the "<u>Fund</u>" or "<u>Debtor</u>"), through its undersigned counsel[1], and respectfully moves this Court to reconsider its Order [Docket No. 33] (the "<u>Order</u>") pursuant to Federal Rules of Bankruptcy Procedure 9023 and/or 9024, and in support thereof STATES and PRAYS as follows:

## I. INTRODUCTION

This Court should vacate the Order since it was based on erroneous facts, distinguishable case law, and more importantly because new evidence has emerged. It must be underscored that this Court issued the Order before granting Debtor time to oppose the subject motions, which prevented Debtor from rectifying the version of events submitted by the Office of the Commissioner of Financial lnstitutions of the Commonwealth of Puerto Rico ("<u>OCIF</u>"). As discussed below, the facts alleged by OCIF in its motions are disputed and the legal extend of the administrative order is not as broad as OCIF proposes. Moreover, on March 12, 2026, the Puerto Rico Department of

---

[1] After the issuance of the Order, Driven proceeded to send a letter to the undersigned counsel advising that he may not represent the Debtor. However, the Order is not yet final, and the undersigned attorney has the legal duty to file this motion on behalf of the Debtor not the Debtor In Possession.

Economic Development and Commerce ("DDEC") issued a letter revoking Debtor's grant under Act 60 and consequently stripping OCIF's alleged power to liquidate the Debtor.

## II. RELEVANT FACTS

1. On June 16, 2025, OCIF filed a Complaint and Order of (I) Cease and Desist, (II) Appointment of Receiver, and (III) Imposition of Administrative Fine (the "First Complaint and Amended Order"), requesting approval to intervene in and control the Fund for alleged serious regulatory noncompliance.

2. In brief summary, in that pleading OCIF requested: (i) that a "cease and desist" be ordered from accepting new investments until the fund demonstrates compliance and transparency; (ii) that an administrative fine (of up to $50,000) be imposed for the noncompliance identified; (iii) that Driven, PSC ("Driven") be appointed as receiver to take control of the fund, investigate its operations, administer its assets, and protect investors; (iv) that a special examination of the Fund be authorized, imposing upon it the obligation to cooperate and deliver all information and documents required; and (v) that the preservation of documents and information be ordered, prohibiting their alteration or destruction.

3. On June 23, 2025, the Fund filed a Motion to Dismiss for Lack of Jurisdiction (the "Motion to Dismiss") before OCIF's Administrative Forum in which it alleged lack of jurisdiction under Act 185 and Act 60, unlawful imposition of a receiver, federal field occupied ("preemption"), violation of due process of law, among other things.

4. On June 25, 2025, OCIF and the Fund entered into a Consent Order of (I) Special Examination and Appointment of Examiner and (II) Additional Actions (the "Consent Order"). They agreed that OCIF would conduct a "special examination" of the Fund through the appointment of Driven as independent Examiner. This Examiner would have broad powers of access to information, review of transactions, financial evaluation, and issuance of reports. For its part, the Fund obligated itself to cooperate fully with the Examiner, deliver documents, allow access to affiliates, and comply with regulatory requirements, and additional actions were established, such as submitting financial reports and notifying investors.

5. It is emphasized that at no time the appointment of a Receiver, as requested by OCIF in the First Complaint and Amended Order, nor the transfer of administration of the Fund, was agreed. What was agreed was the appointment of an Examiner with investigative and supervisory functions, not one of administration or substitution of the management of the Fund. As discussed below, Debtor maintains that OCIF does not have statutory power to appoint a Receiver to the Fund.

6. Since the issuance of the Consent Order, the Fund substantially complied with OCIF's requirements, supplying information and documentation on a continuous basis, including the production of thousands of pages in excessively short periods. Nevertheless, said process developed in practice under a markedly adversarial approach aimed at supporting alleged noncompliance, rather than responding to the investigative and objective nature of a special

examination such as the one originally agreed between the parties. All of this occurred, moreover, while the Fund was being compelled to pay Driven's fees in the hundreds of thousands of dollars, far above what was reasonably authorized and beyond the limits that should have governed the Examiner's actions and OCIF's own regulations.

7. Thus, on February 18, 2026, OCIF filed a pleading titled "Motion for Immediate Reinstatement of Complaint and Amended Order" (the "Motion for Reinstatement"), through which it requested to: (i) take notice that OCIF has reinstated the Amended Complaint; (ii) take notice that OCIF has installed Driven as receiver of the Fund immediately; and (iii) issue an order setting the hearing for the next available date of the Hearing Officer to address the Amended Complaint and the permanent appointment of Driven as receiver of the Fund.

8. On February 18, 2026, OCIF also filed the "Complaint and Amended Order of (I) Cease and Desist, (II) Liquidation of Private Capital Fund, and (III) Interim and Permanent Appointment of Receiver to Carry Out the Liquidation" (hereinafter, the "Second Complaint and Amended Order").

9. The Hearing Officer proceeded to set the hearing to name Driven as permanent receiver for February 26, 2026.

10. Before the hearing to name Driven as permanent receiver was held, Debtor filed the captioned case on February 23, 2026.  See Docket No. 1.

11. On February 25, 2026, OCIF filed two motions in the captioned case.  The first motion requested an order to continue OCIF's actions against Debtor or in the

alternative for relief from the automatic stay (the "Relief from Stay Motion") and the second motion requested an order recognizing Driven as the Debtor In Possession in the captioned case (the "DIP Motion").

12. It must be underscored that the Relief from Stay Motion was scheduled for a hearing on March 24, 2026, and Debtor was granted until March 12, 2026 to file its opposition (see Docket No. 20), and the DIP Motion had no objection term since it was filed as an urgent motion and this Court never granted Debtor and parties in interest a period to file objections.

13. On March 11, 2026, this Court summarily issued the Order before the objection period had elapsed for the Relief from Stay Motion and before issuing any order establishing a deadline to submit objections to the DIP Motion.

14. Separately, on March 12, 2026, the DDEC issued a letter revoking Debtor's tax decree under Act 60 and eliminating the tax benefits retroactively.

15. As a result of this notice from DDEC, Debtor ceased to be a qualified Private Equity Fund under Act 60. This revocation caused a substantial change in the juridical nature of the entity and it ceased to be a "Puerto Rico Private Equity Fund" under the normative framework of Act 60. This implies that the specific regulatory framework that served as the basis for the ongoing administrative intervention by OCIF - including the extraordinary powers of liquidation - vanishes.

16. On March 12, 2026, Driven through OCIF's counsel, sent letters to all of Debtor's professionals, including the undersigned attorney, advising that all

professionals were not authorized to render any services for the Debtor, nor appear on behalf of the Debtor in any matter.  See Docket No. 37.

17. On March 13, 2026, OCIF proceeded to issue an order scheduling an administrative hearing for March 20, 2026 to name Driven as permanent receiver.

18. In this context, it should be noted that, a legal absurdity arose whereas it is Driven's responsibility to appear at the scheduled Hearing in the name and on behalf of the Fund to argue the validity of its own appointment as permanent Receiver - simultaneously placing itself as representative of the Fund and direct beneficiary of the appointment.

## III.    STANDARD FOR RECONSIDERATION

A Motion for Reconsideration is appropriate when there has been a manifest error of law or new evidence. Marie v. Allied Home Mortg. Corp., 402 F.3d 1, (1st Cir. 2005); Pomerleau v. W. Springfield Pub. Sch., 362 F.3d 143, (1st Cir. 2004). Even though the Federal Rules of Civil Procedure nor the Bankruptcy Rules specifically provide for the filing of motions for reconsideration, see, Sierra Club v. tri-State Generation and Transmission Assoc., Inc., 173 F.R.D. 275, 287 (D.C. Col. 1997); Hatfield v. Board of County Comm'rs for Converse County, 52 F. 3d. 858, 861 (10th Cir. 1995), nevertheless this Honorable Court may entertain this motion for reconsideration pursuant to its inherent powers.  See, Jusino v. Zayas, 875 F.2d 986, 989 n. 3 (1st Cir. 1989).  In the alternative this, Honorable Court may entertain this motion as a motion to amend or alter Judgment pursuant to Fed. R. Civ. P. 59(e), or as a motion seeking relief from an order, pursuant to Fed. R. Civ. P. 60(b).  See e.g., Id.  Although Rule 59 (e) refers to judgments,

its legal standards are applied to motions for reconsideration of interlocutory orders. <u>Waye v. First Citizen's National Bank</u>, 846 F. Supp. 310, 314 n.3 (M.D. Pa. 1994); <u>Atlantic Stales Legal Foundation v. Karg Bros. Inc.</u>, 841 F. Supp. 51, 55 (N.D.N.Y. 1993); <u>Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.</u>, 99 F.R.D. 99 (E.D. Va 1983) (motion for reconsideration of order denying motion to dismiss).

## IV. DISCUSSION

The Order rests on two independent legal conclusions, each of which is erroneous. The first holds that an unexecuted and interim administrative receivership order displaced the Fund's existing management as debtor-in-possession.  The second holds that a state-directed liquidation of a $500 million estate falls within the police power exception to the automatic stay.  Each error independently warrants reversal.

### 1.  *The Fund's Management Still Had The Power To File The Bankruptcy Petition And To Act As Debtor In Possession.*

Every case OCIF and this Court relied upon had a final order specifically naming a receiver with powers to file for bankruptcy and/or involved a receiver who had already assumed actual, operational control of the debtor entity before any petition was filed.  In <u>In re Bayou Group, LLC</u>, 564 F.3d 541, 545-46 (2d Cir. 2009), the receiver had functioned as the exclusive managing member of the debtor entities for an extended period before the bankruptcy. He managed assets.  He directed operations.  He served as the sole decision-maker. The Second Circuit recognized his status as debtor-in-possession because he was already the "corporate governor" of the entities.  <u>Id</u>. at 545.  The district court below had been explicit: the receiver was "the exclusive managing member of a debtor-in-possession" who was "subject to all of the obligations imposed on such entities by the Bankruptcy

Code." In re Bayou Grp., LLC, 363 B.R. 674, 688 (S.D.N.Y. 2007). Bayou did not hold that any entity holding an unexecuted and interim administrative receivership order qualifies as debtor-in-possession. It held that a receiver who has already assumed actual management qualifies. The distinction is dispositive. Furthermore, Bayou involved a motion filed by the U.S. Trustee to name a Chapter 11 Trustee; it was not a controversy between the Debtor and the Receiver. This Court's reliance on Bayou to rule that when a receiver is appointed as manager of a debtor entity with authority to control and manage debtor's affairs automatically transforms into a debtor-in-possession is misplaced because it does not take into account that the order granting such powers was final and the receiver had been managing debtor's affairs for an extended period before the bankruptcy filing. Moreover, as aforementioned, the issue was not if the debtor's prior management could be a debtor-in-possession, it was whether a Chapter 11 trustee needed to be named to supersede the receiver.

OCIF and this Court cited the Southern District of New York's decision in S.E.C. v. Byers, 592 F. Supp. 2d 532, 534 (S.D.N.Y. 2008). Therein, the court upheld a provision of a prior order that stated that the receiver would "automatically succeed to [the debtor-in-possession] role by operation of the Bankruptcy Code." But Byers was not a bankruptcy case, it was a District Court case wherein certain provisions of a prior order naming a receiver were being contested. The predicate was that the receivership order had authorized the receiver to control and manage the entity - and the receiver was exercising that authority. Id. The factual predicate that drove Byers is entirely absent here.

The principle these cases establish is straightforward: a receiver becomes the debtor-in-possession when, and only when, the receiver is the person in actual control at

the time the case commences. An order that purports to confer control is not the same as an order that has conferred control. Section 1101(1) and Rule 9001(5) operate on facts, not aspirations.

The structural consequences of sustaining the Order amplify the error. If an unexecuted interim administrative receivership order sufficed to override Section 1101(1), then any regulator in any jurisdiction could render Section 1104 a dead letter simply by issuing an appointment on the eve of a bankruptcy filing. Section 1104 is the exclusive mechanism the Code provides for displacing a debtor-in-possession. It demands notice. It demands a hearing. It demands an evidentiary showing of cause - "fraud, dishonesty, incompetence, or gross mismanagement" – or a demonstration that displacement serves the interests of creditors, equity holders, and the estate. 11 U.S.C. § 1104(a)(1)-(2). It demands proof by clear and convincing evidence. See In re G-I Holdings, Inc., 295 B.R. 502, 508 (D.N.J. 2003), aff'd, 385 F.3d 313 (3d Cir. 2004). Courts apply a strong presumption against appointment because "it is settled that appointment of a trustee should be the exception, rather than the rule" - existing management is "generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." Id. (quoting In re Marvel Ent. Grp., Inc., 140 F.3d 463, 471 (3d Cir. 1998)).

OCIF satisfied none of these requirements. It did not file a Section 1104 motion. It did not establish cause. It did not make an evidentiary showing. It did not submit to the procedural requirements Congress prescribed. The Order effectively permitted OCIF to achieve through administrative fiat what Section 1104 requires a court to decide after rigorous procedural safeguards. More importantly, upon information and belief, Driven provides or have provided services to several of Debtor's creditors, which would disqualify

it for the debtor in possession/trustee role as not being a disinterested party. That is not how the Code works.

The custodian provisions of the Code reinforce the point from yet another angle. To the extent Driven qualifies as a "custodian" under 11 U.S.C. § 101(11)(A) - a receiver appointed in a proceeding not under the Code - the statute tells the Court exactly what must happen. Section 543(a) prohibits the custodian from administering estate property once a case commences: Section 543(b) requires the custodian to deliver property to the debtor-in-possession and file an accounting. Section 543(d) permits the court to excuse compliance only after notice, a hearing, and a finding that creditors' interests would be better served by allowing the custodian to remain in possession. See In re 400 Madison Ave. Ltd. P'ship, 213 B.R. 888, 894 (Bankr. S.D.N.Y. 1997) (custodian retained under Section 543(d) limited to "preservation and care of the property under his control"). The direction of the statute is unmistakable: custodians answer to the debtor-in-possession - not the other way around. The Order inverts this statutory design. lt converts a turnover obligation into a takeover right and transforms a duty to surrender into a license to seize. Nothing in the Code permits that result.

OCIF's own administrative proceedings underscore the weakness of its position from yet another angle. The Receivership Order appointed Driven on an interim basis, pending the outcome of a hearing scheduled for February 26, 2026. (ECF No. 14-1 at 34-36). That hearing never occurred - the Fund filed its petition three days before it was set to take place. OCIF thus asked this Court to treat as settled a question that OCIF's own adjudicative forum had not yet resolved. The very administrative process on which OCIF relies had not reached a final determination as to whether Driven should serve as receiver on a permanent basis, much less whether Driven should displace the Fund's existing

management.  If OCIF's own forum had not yet confirmed the appointment, this Court had no basis to assume its validity - let alone to extend its effect into a federal bankruptcy proceeding as a substitute for the process the Code prescribes.

OCIF's reliance on Puerto Rico statutory and case law does not alter the analysis. The question is not whether OCIF had authority under Puerto Rico law to appoint a receiver.  The question is who constitutes the debtor-in-possession under 11 U.S.C. § 1101(1). That question is governed by federal law, and it turns on a factual inquiry that no amount of Puerto Rico regulatory authority can alter.  Even if OCIF had lawful authority to issue every order it issued - a proposition the Debtor does not concede - the result would be the same.  The Receivership Order was never carried into effect.  Driven never assumed control.  The Code asks who was in control, and the answer remains the Debtor's existing management.

Section 1101(1) of the Code defines the debtor-in-possession as the "debtor." When the debtor is an entity, Rule 9001(5)(A) identifies the debtor as any "person in control." The operative phrase is "in control" - not "designated," not "authorized," not "appointed." The statute demands a factual predicate.  The relevant inquiry is functional: who actually managed the debtor's business and affairs on the Petition Date?

The undisputed record - drawn from OCIF's own filings - answers the question. Three admissions are dispositive.  First, "[Driven] obtained no possession of any physical assets of the Fund." (ECF No. 14, ¶ 38).  Second, "[Driven] was not granted any information about any bank accounts of the Debtor." (Id. ¶ 39).  Third, Driven "was ultimately only granted access (after several failed attempts) to the Fund's cloud-based system" on February 19, 2026 - four days before the Petition Date. (Id. ¶ 40).  No operational control.  No asset possession.  No Financial access.  No management

authority.  Driven had five days between the Receivership Order and the Petition Date, and all it accomplished was access to a document repository.  Browsing files on a server is not running a business, and it is certainly not managing a debtor-in-possession.

On the other side of the ledger, the Fund's President authorized, executed, and filed the voluntary petition on the Petition Date "in the exercise of full corporate authority." (ECF No. 1 at 4).  He did so because he was the person managing the Fund's affairs.  He was the "person in control" within the meaning of Rule 9001(5)(A).  The Debtor's existing management constitutes the debtor-in-possession under Section 1101(1).  He also executed the Schedules and Statement of Financial Affairs, documents that Driven would have never been able to execute because its was never in control of Debtor and admittedly never concluded its examination of Debtor.  He even participated in the Initial Debtor Interview before the US Trustee.

The Court's ruling to the contrary rests on the Receivership Order's purported conferral of authority. But the Code does not ask what should have happened.   It asks what happened.  And what happened is that the Receivership Order was never carried into effect.   Paper authority is not actual authority. Not under the Code. Not under the Bankruptcy Rules.  And not under a single case OCIF cited in its motions and this Court relief upon for the Order.

### 2.  *The Enforcement Action Fails Both Tests for the Police Power Exception.*

The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." <u>Midlantic Nat'I Bank v. NJDEP</u>, 474 U.S. 494, 503 (1986).  It "provides for a broad stay of litigation, lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims." 3 COLLIER ON BANKRUPTCY, ¶ 362.01

(Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2018). Section 362(a)(1) stays the commencement or continuation of any administrative action against the debtor. Section 362(a)(3) stays any act to obtain possession of estate property or to exercise control over estate property. The Enforcement Action triggers both provisions.

Congress enacted Section 362(b)(4) to carve out a narrow exception for governmental actions to enforce police and regulatory power. The legislative history leaves no ambiguity about its intended scope. Both chambers explained that the exception "is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." 1978 U.S. CODE CONG. & AD. NEWS at 6444-45 (remarks of Rep. Edwards); Id. at 6513 (remarks of Sen. DeConcini). The House Report further explained that the exception applies where "a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law." H.R. REP. No. 95-595, at 343 (1978). OCIF does none of these things. It liquidates.

The First Circuit applies two "interrelated, fact-dominated inquiries" to determine whether a governmental action qualifies: the pecuniary purpose test and the public policy test. In re Ruiz, 122 F.4th 1, 14 (1st Cir. 2024); McMullen v. Sevigny (In re McMullen). 386 F.3d 320, 325 (1st Cir. 2004). Both tests look past the government's characterization of its own action and examine what the action actually does. Both are driven by facts, not labels. And both lead to the same conclusion: the Enforcement Action is not a legitimate exercise of police power.

Start with the pecuniary purpose test. The exception does not apply where the

governmental action relates primarily to a pecuniary interest in estate property rather than to matters of public safety. <u>McMullen</u>, 386 F.3d at 325; <u>Ruiz</u>, 122 F.4th at 16 ("a pecuniary interest of the government itself cannot be the primary purpose of the government's action"). OCIF insists that the Receivership Order's purpose is "not to seek any pecuniary interest whatsoever." (ECF No. 13 at 20-21). That concession proves the Debtor's point, not OCIF's. The Receivership Order imposes no fine. lt revokes no license. It orders no compliance with reporting requirements. Strip away every provision that relates to the liquidation and distribution of estate assets, and the Receivership Order has no operative content left. Liquidation and distribution are not byproducts of the Receivership Order. They are the Receivership Order.

The operative provisions confirm this beyond dispute. The Receiver seizes all assets, with authority to dispose of, transfer, or convert them. (Receivership Order § VIII.A.2). The Receiver substitutes bank signatories and freezes accounts. (<u>Id</u>. § VIII.A.7). The Receiver exercises "clawback" authority against affiliated entities. (<u>Id</u>. § VIII.A.9). The Receiver establishes a claims bar date, adjudicates creditor claims, and prepares a Final Liquidation and Distribution Report. (<u>Id</u>. § VIII.B.21). The entire enterprise is directed at a single objective: converting estate assets into cash and distributing that cash to creditors. That is pecuniary to its core. A governmental unit does not escape the pecuniary purpose test simply by placing itself at the helm of the liquidation rather than on the receiving end of the proceeds.

The public policy test confirms the point. The exception covers proceedings that effectuate public policy but does not extend to proceedings that adjudicate private rights. <u>McMullen</u>, 386 F.3d at 325; <u>Ruiz</u>, 122 F.4th at 14-16. The Receivership Order does precisely what the public policy test forbids. It establishes a claims adjudication process:

a bar date, a validation procedure, and a distribution plan subject to OCIF's approval. (Receivership Order § VIII.B.21). It authorizes the Receiver to evaluate prior transactions and exercise "clawback" authority. (Id. § VIII.A.9). lt authorizes the Receiver to terminate contracts. (Id. § VIII.A.13). Each function involves the adjudication of private rights: the rights of creditors to payment, the rights of contracting parties to performance, the rights of affiliated entities to retain property. None of these provisions regulate future conduct. None enforce a standard of compliance. None protect the public in any sense distinct from satisfying private claims.

These are not legitimate regulatory functions. They are the core functions of bankruptcy administration - functions Congress assigned to the bankruptcy court through Sections 501 and 502 (claims allowance), Sections 544 through 553 (avoidance and recovery), and Section 1129 (plan confirmation). The Receivership Order creates a parallel regime that duplicates and displaces each. The Receiver's claims bar date supplants Sections 501 and 502. The Receiver's "clawback" authority supplants Sections 544 through 553. The Final Liquidation and Distribution Report supplant the plan confirmation process of Section 1129. And the provision that disputes are resolved by OCIF through its own administrative adjudication - not by this Court - displaces the bankruptcy court's jurisdiction entirely. (Id. § VIII.B.21(d)-(e)). That is the wholesale substitution of an administrative insolvency regime for the federal bankruptcy system Congress created. The police power exception does not authorize that result.

The cases OCIF cited only sharpen the contrast. OCIF's principal authority, SEC v. First Financial Group, lnc., 645 F.2d 429 (5th Cir. 1981), involved a federal regulator prosecuting active securities fraud, with a temporary receiver appointed by a federal court to preserve assets pending litigation. Id. at 437-39. Every distinguishing factor matters.

The government action in <u>First Financial</u> was a fraud prosecution - the paradigmatic exercise of police power. OCIF prosecutes no fraud. The Enforcement Action rests on reporting failures and an incomplete examination. The receiver in <u>First Financial</u> was appointed by a court, subject to judicial oversight and due process. Driven was appointed by OCIF in its own administrative forum, without notice and without a hearing. The receivership in <u>First Financial</u> was temporary, designed to "maintain the *status quo"* and prevent "diversion and waste." <u>Id</u>. at 438. The Receivership Order is permanent, designed to liquidate the estate. And the Fifth Circuit explicitly noted that the receiver's appointment "itself serves to prevent dismemberment of the corporate estate by management personnel who have been found to have acted fraudulently." <u>Id</u>. at 439. No court has found that the Fund's management acted fraudulently. The special examination that might have provided a factual basis was never completed. OCIF concedes as much. (ECF No. 13, ¶ 20).

OCIF's remaining authorities follow the same pattern: federal regulators prosecuting fraud in judicial proceedings, with court-appointed temporary receivers preserving assets. <u>See</u> <u>SEC v. Wolfson</u>, 308 B.R. 612 (2004); <u>SEC v. Morriss</u>, No. 4:12-CV-80 CEJ, 2012 WL 2154903 (E.O. Mo. June 13, 2012); <u>FTC v. R.A. Walker & Associates, lnc.</u>, 37 B.R. 608 (D.D.C. 1983). None involved a state administrative agency's effort to liquidate a bankruptcy estate through an administrative proceeding conducted under the agency's own exclusive supervision. The legal and factual distinctions are dispositive. OCIF also cited <u>SEC v. Brennan</u>, 230 F.3d 65 (2d Cir. 2000), for the proposition that courts "have regularly countenanced governmental action to safeguard" assets. (ECF No. 13 at 22). That language comes from Judge Calabresi's *dissent*. <u>Id</u>., at 80 (Calabresi, J., dissenting). A dissent is not the law of any circuit. That OCIF must reach

into a dissent for support underscores how far its position strays from established authority.

OCIF also invoked Judge Swain's decision in <u>In re Financial Oversight & Management Board for Puerto Rico</u>, No. 17 BK 3283-LTS, 2025 WL 3078311 (D.P.R. Oct. 27, 2025), for the proposition that the police power exception extends beyond public health and safety to encompass broader "regulatory efforts to protect public welfare." The Debtor does not dispute that proposition. But OCIF reads the decision for far more than it holds. <u>FOMB</u> did not involve the appointment of a receiver or liquidator. It did not involve the creation of a parallel claims process with a bar date and distribution plan. It did not involve the displacement of a debtor-in-possession. And it did not involve a government agency seeking to liquidate estate assets and distribute them to private creditors through its own administrative forum. The question here is not whether the police power exception is broad. The question is whether it is broad enough to encompass the creation of an alternative insolvency regime that would supplant the bankruptcy case entirely. <u>FOMB</u> did not address that question and does not answer it. The principle that the exception is broad does not mean that it is boundless.

The Debtor does not suggest that OCIF lacks regulatory authority over private equity funds under Puerto Rico law. It plainly has such authority. Nor does the Debtor contend that every exercise of that authority is subject to the automatic stay. It is not. OCIF remains free to investigate the Fund, to issue findings, to impose fines, to revoke licenses, to pursue cease and desist orders, and to take any other regulatory action within its mandate - none of which requires lifting the stay. What OCIF may not do is use the police power exception as a vehicle to liquidate the estate and distribute its assets outside the jurisdiction of this Court. The exception does not reach that far.

The consequences of the Order are staggering. If a state administrative agency can invoke the police power exception to continue an administrative liquidation - complete with a receiver, a claims process, a bar date, and a distribution plan - then the automatic stay provides no protection against the very governmental overreach it was designed to prevent. Any regulator dissatisfied with a regulated entity could bypass the Code by issuing a liquidation order on the eve of a bankruptcy filing and then claiming the exception. Section 1104 would become surplusage. The claims allowance process under Sections 501 and 502 would yield to whatever administrative procedure the regulator devises. The avoidance powers under Sections 544 through 553 would be duplicated by agency-conferred "clawback" authority operating outside the Code. And the plan confirmation requirements under Section 1129 would be replaced by an agency-approved distribution plan subject to no judicial scrutiny. Congress did not design Chapter 11 to be circumvented so easily.

### 3. Legal Effect Of The Revocation Of The Act 60 Tax Decree

Lastly, and as aforementioned, on March 12, 2026, the DDEC issued a letter by which it revoked the tax decree granted to Debtor under Act No. 60-2019, also eliminating its tax benefits retroactively. A copy of the letter is attached hereto as **Exhibit A**.

As a result of this determination, and as a direct consequence thereof, Debtor ceased to be, as a matter of fact and law, a qualified "Puerto Rico Private Equity Fund" under Act 60. This revocation is not an immaterial alteration with marginal effects upon the fund; it is a material and substantial change in the juridical nature of the entity, which ceases to operate within the special normative framework that defined its regulatory condition and that, in turn, served as the basis for OCIF's administrative intervention.

That is, while the decree was in force, Debtor was subject to a particular regulatory regime, which included the granting of tax benefits conditioned on compliance with specific statutory requirements, as well as supervision by OCIF pursuant to the provisions of Act No. 185-2014, Section 2044.03 of Act 60, and Regulation No. 9461. Said regime constituted the legal framework that enabled and made viable OCIF's regulatory jurisdiction.

However, once the decree was revoked, that normative framework ceased to exist with respect to Debtor. From that moment on, the entity ceased to be a qualified fund under Act 60 and became, in law, an ordinary entity, that is, a limited liability company or an investment vehicle without the decree that activated OCIF's regulatory regime.

This change has immediate and determinative legal consequences. It is well known that administrative jurisdiction is not presumed or extended by analogy; it requires an express, current, and applicable legal basis to the regulated entity in its current juridical state. In the absence of that foundation, all administrative action lacks validity. Thus, when OCIF's intervention, including extraordinary measures such as liquidation or the intended and improper receivership, is supported by regulatory provisions that apply exclusively to qualified entities under Act 60, the disappearance of that status necessarily entails the loss of the normative foundation that permitted OCIF's intervention, particularly when at the time of the revocation there was not an order for a permanent receiver.

In this context, it is incumbent upon OCIF - as a matter of primary jurisdiction - to express and demonstrate clearly, specifically, and with grounds what is the legal basis that allows it to continue exercising regulatory powers over Debtor after revocation of the

Case No. 26-00712 (ESL)                                                                    **Page 20**

decree. The agency cannot simply assume the subsistence of its jurisdiction nor project it into the future as if the change in juridical status was irrelevant.

In summary, the revocation of the decree granted to Debtor constitutes a material juridical change that deprives of legal basis the normative framework that sustained OCIF's intervention. From the revocation of the decree onward, OCIF could continue acting only if it identifies and demonstrates an independent and valid source of jurisdiction.

## **CONCLUSION**

The Order should be vacated insofar as all case law and facts relied by this Court were misapplied. OCIF's order was not final, it was never carried out, Debtor always maintained control, the police power exception is not applicable, and the revocation of the tax decree is new evidence that strips OCIF of jurisdiction to continue with its proposed liquidation. Lastly, Debtor understands that a hearing would be beneficial for this Court to hear all the relevant facts and arguments. It must be underscored that Debtor was never granted its day in court nor the option to oppose the motions filed by OCIF since this Court issued the Order before the period of time to oppose the Relief from Stay Motion and without establishing an objection period for the DIP Motion.

**WHEREFORE,** the Debtor respectfully requests that this Court: (1) vacates the Order; or (2) schedule a hearing to discuss all relevant facts and arguments; and (3) grant such other relief as this Court deems just and proper.

**CERTIFICATE OF SERVICE:** I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the Assistant US Trustee, and all participants of CM/ECF.

**Case No. 26-00712 (ESL)** **Page 21**

San Juan, Puerto Rico, this 25th day of March, 2026.

**FUENTES LAW OFFICES, LLC**
P.O. Box 9022726
San Juan, Puerto Rico 00902
Tel.: (787) 722-5216
Fax: (787) 483-6048
fuenteslaw@icloud.com

*s/Alexis Fuentes-Hernandez, Esq.*
**Alexis Fuentes Hernández, Esq.**
Bar No. 217201