**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | Case No. 26-00712-ESL |
| THE PHOENIX FUND LLC, | Chapter 11 |
| Debtor | |

**MOTION FOR STAY PENDING APPEAL**

COMES NOW The Phoenix Fund Advisor, LLC ("TPFA"), in its capacity as Manager of The Phoenix Fund LLC (the "Fund" or the "Debtor"), by and through undersigned counsel, hereby appeals to the United States District Court for the District of Puerto Rico (the "District Court") from the Opinion and Order entered by the Honorable Enrique S. Lamoutte, United States Bankruptcy Judge, on March 11, 2026 (the "Order").

**I.      INTRODUCTION**

The Order granted two interrelated motions filed by the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico ("OCIF," per its Spanish acronym).

*First*, the Order granted OCIF's Amended Motion for Entry of an Order to Continue OCIF's Enforcement Action or, in the Alternative, for Relief from the Automatic Stay (ECF No. 13). The Court held that the automatic stay of 11 U.S.C. § 362(a) is inapplicable to OCIF's Enforcement Action - including the Amended Complaint and Receivership Order, the Consent Order, and the appointment of Driven, P.S.C ("Driven") as Receiver – under the police power exception of 11 U.S.C. § 362(b)(4).

*Second*, the Order granted OCIF's Urgent Motion for Order Recognizing Authority of

the Pre-Petition Receiver, Driven P.S.C., to Act on Behalf of Debtor-in-Possession (ECF No. 14). The Court recognized Driven as the entity authorized to act as debtor-in-possession on behalf of the Fund under 11 U.S.C. § 1101(1), thereby displacing the Debtor's management – including TPFA as Manager and transferring control of the Chapter 11 case to an administratively appointed receiver.

The combined effect of the Order is to validate and enforce an interim, yet legally unsupported, administrative receivership that displaces the Debtor's existing management and vests full control of the bankruptcy estate in the Receiver.

TPFA, as the Debtor's Manager, appeals. And unless this Court stays the Order pending that appeal, there will be nothing left to appeal.

The facts are stark. On February 18, 2026, OCIF issued its Amended Complaint and Order of Cease and Desist, Liquidation of Private Equity Fund and Interim and Permanent Appointment of Receiver to Carry Out the Liquidation (the "Receivership Order"), purporting to appoint Driven, P.S.C. ("Driven" or the "Receiver") as receiver of the Fund with plenary authority over its affairs.

The Receivership Order itself reveals the true objective of OCIF's administrative proceeding as well as its incongruencies (the "Enforcement Action"). It is not a limited regulatory measure, but a comprehensive displacement of the Fund's contractual governance structure, in direct contravention of its governing Operating Agreement ("Operating Agreement") **See Exhibit 1**.

Under the Operating Agreement, TPFA is expressly designated as the Manager and is vested with the exclusive authority to manage, operate, and control the business and affairs of the Fund. The Enforcement Action disregards that framework entirely.

By appointing Driven, *who was appointed as Examiner in the Consent Order,* as Receiver of the Fund and vesting it with operational control over the Fund, OCIF supplants the Manager designated in the Operating Agreement and transfers that authority to a third party with no contractual or statutory basis to assume it. In doing so, the Enforcement Action does not regulate the Fund; it rewrites its governance structure.

The scope of the Receivership Order confirms that displacement. It directs the Receiver to assume "immediate and total control" of the Fund, seize all assets, substitute bank signatories, freeze accounts, investigate prior transactions, exercise claw back powers, establish a claims bar date, adjudicate creditor claims, prepare a final liquidation report, and distribute the estate's proceeds—all subject solely to OCIF's review and approval. (Receivership Order §§ VIII.A). Disputes are not resolved by any court, but by OCIF itself through administrative adjudication. (*Id.* § VIII.B.21(d)-(e)).

Even more troubling, TPFA was not made a part of the administrative proceedings at OCIF. On March 19, 2026, it filed a Motion to Intervene to address the staggering due process violations of the Receivership Order, as well as the complete absence of agency's regulatory power to impose a receivership on a Private Equity Fund - an issue that is discussed further below.

OCIF's Receivership Order is not regulation, it's the functional equivalent of a Chapter 7 liquidation administered by an administrative agency, displacing both the Operating Agreement and the federal bankruptcy framework. The latter, more within the realm of bankruptcy proceedings, the Receivership Order imposes a regulatorily unsupported and conflicted Receiver on the Debtor, bypassing the requirements of 11 USC § 1104, and the structure of Chapter 11.

This case is not about deference to an agency, it is about whether an agency can create, through administrative action, a receivership power the Legislature never granted, and then project that unlawful act into federal bankruptcy proceedings.

The internal inconsistency is further magnified by the identity of the Receiver. Driven, the Examiner tasked with investigating the Fund, is elevated into the role of Receiver, thereby collapsing the distinction between evaluator and operator. The same entity that conducted the examination is now charged with enforcing, validating, and operationalizing its own findings. In effect, Driven becomes **"the referee, the player, and the scorekeeper at once,"** exercising control while simultaneously judging the propriety of its own prior conduct.

Compounding these defects, TPFA, the Fund's Manager expressly vested with exclusive authority under the Operating Agreement, was displaced without ever being made a party to the administrative proceeding, without notice, and without an opportunity to be heard. The Enforcement Action thus extinguishes contractual and property rights in absentia, in direct violation of fundamental due process.

Finally, the Bankruptcy Court's validation of this framework cannot cure its defects. The receivership not only fails to comply with the requirements governing the appointment of a trustee or receiver under the Bankruptcy Code, including Section 1104, but is independently ultra vires. OCIF lacks the legal or regulatory authority to impose an operational receivership over a private equity fund such as The Phoenix Fund, LLC. Where the Legislature intended to confer such extraordinary power, it did so expressly. Its absence here is dispositive.

The traditional four-factor test for a stay pending appeal under Rule 8007 overwhelmingly favors the Debtor. Each factor, standing alone, warrants the stay. Together, they compel it.

4

*First,* the Debtor will likely prevail on the merits. The Order rests on two independent legal errors. On the debtor-in-possession question, the Code demands facts - not aspirations. Section 1101(1) and Rule 9001(5) define the debtor-in-possession as the person in actual control. Existing management retained actual control and filed the petition. OCIF cannot bypass 11 U.S.C. § 1104's requirements for displacing management simply by issuing an eleventh-hour administrative decree. Moreover, the interim order is in itself unlawful, as OCIF lacks any legal or statutory power to impose an administrative receivership on a Private Equity Fund as the Debtor.

*Second,* irreparable harm is not merely likely - it is certain. Without a stay, OCIF will immediately liquidate the $500 million estate in a parallel administrative forum of its own creation, completely lacking judicial oversight or Code protections. That will render this Chapter 11 case a nullity, permanently strip this Court of its jurisdiction, and irrevocably destroy the Debtor's right to reorganize. An appeal decided after the estate has been dismembered is no appeal at all.

*Third,* OCIF suffers no harm from a stay. Maintaining the *status quo* simply keeps the $500 million estate under the supervision of this Court. The Code protects creditors through Section 1107(a) fiduciary duties, transparency requirements, and United States Trustee oversight. OCIF loses nothing but the ability to unilaterally liquidate the estate outside federal jurisdiction.

*Fourth,* the public interest demands the stay. The fundamental architecture of Chapter 11 - and the supremacy of federal bankruptcy law - depends on it. No state regulator gets to override the Code or displace a federal bankruptcy court through administrative fiat.

## II.    TPFA'S STANDING

TPFA has standing to prosecute this appeal. TPFA is not a peripheral or derivative actor, it is the Manager and Managing Member of the Debtor, expressly designated under the *Amended and Restated Limited Liability Operating Agreement of The Phoenix Fund, LLC* (the "Operating Agreement"), and vested with exclusive authority over the management, operation, and control of the Fund.

Pursuant to the Operating Agreement, TPFA holds exclusive authority to manage, operate, and control the business and affairs of the Fund. This authority extends to all aspects of the Fund's administration and operations, including its assets, financing, contractual relationships, litigation, and personnel. TPFA also acts as the Fund's agent, with full power to bind it, and is authorized to enter into contracts, manage assets, obtain financing, retain professionals, conduct litigation, and direct the Fund's day-to-day operations.

The Order directly and adversely affects TPFA's rights by stripping it of all authority over the Fund and the Chapter 11 case. Displaced management retains standing to challenge the order that effected its displacement, provided it qualifies as a "person aggrieved"—that is, a party whose rights or interests are directly and adversely affected by the order on appeal. See *In re C.W. Mining Co.*, 636 F.3d 1257, 1260–61 (10th Cir. 2011); *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 741–42 (3d Cir. 1995). TPFA served as the Fund's Manager, and the Order eliminated its authority in its entirety. It is the paradigmatic "person aggrieved."

Accordingly, TPFA is not only a "person aggrieved," but an entity whose independent contractual, managerial, and property rights have been directly adjudicated and impaired by OCIF's Order without due process. This constitutes a direct, immediate, and substantial injury sufficient to confer appellate standing.

### III.  **STANDARD OF REVIEW**

Federal Rule of Bankruptcy Procedure 8007(a)(1) authorizes the bankruptcy court to stay its own order pending appeal. See FED. R. BANKR. P. 8007(a)(1)(A). The provision permits the court to "suspend, modify, restore, or grant an injunction" while an appeal is pending. Id. Courts evaluate four factors: (**1**) whether the movant has demonstrated a likelihood of success on the merits; (**2**) whether the movant will suffer irreparable injury absent the stay; (**3**) whether the stay will substantially harm other parties; and (**4**) whether the stay serves the public interest. In re Forty-Eight lnsulations, lnc., 115 F.3d 1294, 1300 (7th Cir. 1997).

The Supreme Court derived this four-factor test from the traditional standard governing injunctive relief, adapted for the stay context. See Nken v. Holder, 556 U.S. 418, 434 (2009). The first two factors - likelihood of success and irreparable harm - are "the most critical," and the movant must establish both to obtain a stay. Id. at 434. But the factors are not applied in isolation. They operate on a "sliding scale": a stronger showing on one factor may offset a weaker showing on another. In re Sabine Oil & Gas Corp., 551 B.R. 132, 140 (Bankr. S.D.N.Y. 2016).

The standard does not demand certainty of reversal. It demands a "substantial case on the merits" - a showing that the questions raised on appeal are "serious, substantial, difficult and doubtful." Id. The movant need only demonstrate that the appeal raises issues "sufficiently serious to be the subject of further deliberation and review." In re Aero Technologies LLC, 650 B.R. 711, 718 (Bankr. S.D. lnd. 2023). Where the underlying questions involve matters of statutory interpretation and the scope of regulatory exemptions under the Code, the standard is particularly apt, because such questions present the kind of legal issues on which reasonable jurists may disagree - and on which appellate courts regularly correct trial courts.

Where - as here - the order under appeal would effectively moot the entire bankruptcy case if not stayed, the balance of harms weighs heavily in favor of maintaining the *status quo*. See Nken, 556 U.S. at 434. The purpose of a stay pending appeal is to preserve the court's ability to render a meaningful decision. An appellate court cannot unscramble a liquidated estate. The function of the stay is to ensure that when the appellate court speaks, its words have consequence.

## IV. DISCUSSION

### A. THE DEBTOR WILL LIKELY SUCCEED ON THE MERITS.

The Order rests on three independent legal conclusions, each of which warrants reversal. *First,* it gives deference and validates an interim administrative receivership that the agency had no legal or regulatory authority to impose on a private equity fund such as The Phoenix Fund, based in part on OCIF's mischaracterization of the scope of its own authority. *Second,* it concludes that an administrative interim Receivership Order effectively displaced the Fund's existing management as debtor-in-possession, in direct contravention of 11 U.S.C. § 1101(1) and Rule 9001(5), which turn on actual control, not nominal designation. *Third,* it holds that a state-directed liquidation of a $500 million estate falls within the police power exception to the automatic stay, notwithstanding that the Enforcement Action is quintessentially pecuniary in nature and replicates core bankruptcy functions. Each error independently requires reversal. Taken together, particularly given the legally flawed premise presented to the Bankruptcy Court, they demonstrate that the Order cannot be sustained and must be vacated in its entirety.

### 1. *The administrative receivership was ultra vires and legally unsupported.*

At the outset, and as the central premise of this appeal, the Receivership Order lacks

any legal or regulatory foundation. The defect is compounded by the nature of the administrative proceeding itself. The Receivership Order was interim, issued pending further proceedings, and never ripened into a final adjudication displacing the Debtor's management. OCIF thus asked the Bankruptcy Court to treat as settled a matter that remained actively contested and unresolved in the administrative forum itself.

More fundamentally, TPFA in its capacity as Manager and on behalf of the Debtor, has separately challenged the administrative receivership because there is no legal or regulatory foundation authorizing OCIF to impose an operational receivership on a private capital fund such as Phoenix. The governing statutes permit examination, inspection, and certain remedial measures, but they do not authorize OCIF to appoint an operating receiver to take control of the fund's assets, operations, and management structure. Where the Legislature intended to confer such authority, it did so expressly. Its failure to do so here is decisive.

That absence of authority is confirmed by the statutory framework governing OCIF's powers. The Office of the Commissioner of Financial Institutions Act, Act No. 4-1985, strictly limits OCIF's jurisdiction to a taxative list of "financial institutions." See 7 L.P.R.A. § 2004(g). Private capital funds organized under Act No. 185-2014 or Act No. 60-2019 are not included in that list. The omission is dispositive. Where the Legislature enumerates specific entities subject to regulation, all others are excluded (*expressio unius est exclusio alterius*). OCIF therefore cannot invoke the enforcement or intervention powers of Act 4-1985 against the Debtor, and any attempt to do so exceeds its statutory jurisdiction and is **void.**

Even assuming *arguendo* that some measure of supervisory authority, Act 4-1985 does not authorize the appointment of an operational receiver. Its enforcement provisions are limited to cease-and-desist orders and related administrative remedies. See 7 L.P.R.A. § 2010(10).

Nowhere does the statute confer authority to displace management, seize control of assets, or install a third party with full operational authority over an entity. The receivership imposed here does precisely that, confirming that it is not grounded in any delegated statutory power.

The statutes that do govern private capital funds further underscore the point. Act No. 185-2014 and Act No. 60-2019 define OCIF's role narrowly, limiting it to examinations, inspections, and compliance-related measures. See 7 L.P.R.A. § 3115(b)(4); 13 L.P.R.A. § 45363(g)(2)(D). Although those statutes contemplate certain corrective actions in cases of noncompliance, including liquidation or the suspension of offerings, they conspicuously omit any authority to appoint a receiver or to supplant the fund's management. That omission is not incidental. In closely related statutory schemes, the Legislature expressly granted OCIF the authority to appoint receivers when it intended to do so. See, e.g., 7 L.P.R.A. § 3096(a).[1] The deliberate inclusion of that power elsewhere, and its omission here, confirms that no such authority exists with respect to private capital funds.

Nor can OCIF cure this absence of statutory authority through regulation. Regulation 9551 attempts to expand the definition of "financial institutions" to include entities "*subject to*

---

[1] § 3096. Dissolution

**(a)** The Commissioner may, among other alternatives, appoint a receiver and order the dissolution of an international financial institution if the license of said international financial institution or of the person of which the international financial institution is a unit, is revoked or surrendered pursuant to § 3095 of this title.

**(b)** The receiver appointed shall be a person of recognized moral integrity, with vast experience in the field of banking or finance, and his/her performance with the international financial institution shall be secured by an adequate bond, to be paid by the international financial institution itself.

**(c)** The receiver shall manage the international financial institution in accordance with the provisions of this chapter and shall:

**(1)** Take possession of the assets and liabilities, books, records, documents and files which belong to the international financial institution;

**(2)** collect all loans, charges, and fees owed to the international financial institution;

**(3)** pay all obligations and debts of the international financial institution after having paid the necessary costs of the receivership, and

**(4)** supervise the dissolution and liquidation of the international financial institution.

*OCIF's supervision or oversight.*" Reg. 9551, § 1.7(9). That expansion directly conflicts with the statutory definition of financial institutions set forth in 7 L.P.R.A. § 2004(g)[2] and is therefore invalid. The statute's taxative list of seventeen covered entities does not include

---

[2] § 2004. Definitions

**(g) *Financial Institutions.*—** Shall mean and include:

**(1)** Every banking institution doing business in Puerto Rico, pursuant to the provisions of §§ 1 et seq. of this title, known as the "Puerto Rico Banking Law".
**(2)** Every small personal loan company organized under §§ 941—959 of Title 10, known as the "Small Personal Loan Act".
**(3)** Every domestic savings bank doing business in Puerto Rico.
**(4)** Any trust company doing trust business and functions in Puerto Rico under the provisions of §§ 301—503 of this title, known as the "Trust Companies Act".
**(5)** Any corporation or person which does business in Puerto Rico who is subject to the licensing requirements under the provisions of §§ 1051—1063 of this title, known as the "Mortgage Institutions Act".
**(6)** Every real estate investment trust which does business in Puerto Rico, except when it distributes 90% or more of its annual net income to its stockholders.
**(7)** Any other institution or person who engages in the financial mediation business as a money broker, agent, or as an investment, deposit, loan or financing broker or mediator, with a combined volume of business in excess of ten thousand dollars ($10,000), without being specifically authorized for such purposes by any law or regulation. Subject to the provisions of §§ 2101 et seq. of Title 3, the Commissioner is hereby empowered to approve, promulgate, amend, enact, apply and enforce the rules, regulations, orders, resolutions and determinations he/she deems necessary or convenient in order to authorize, deny, regulate, supervise and investigate the activities and persons described in this clause.
**(8)** Any person or personal property leasing company which does business in Puerto Rico under §§ 996—996*l* of Title 10, known as the "Personal Property Leasing Act".
**(9)** Any company engaged in the sale of drafts that operates under Act No. 17, approved May 3, 1967, known as the "Act to Regulate the Sale of Drafts".
**(10)** Any company engaged in the financing of retail sales under §§ 731—793 of Title 10, known as the "Retail Sales and Finance Companies Act".
**(11)** Any company engaged in the business of financing industrial and commercial contracts under Act No. 86, approved 24, 1954, the "Industrial and Commercial Financing Contracts Act".
**(12)** Any International Banking Entity organized under the International Banking Center Regulating Act, Act No. 16, approved July 2, 1980.
**(13)** Any investment company which does business in Puerto Rico under the provisions of the Puerto Rico Investment Companies Act, §§ 661—683 of Title 10.
**(14)** Any stockbroker which does business in Puerto Rico under §§ 851—895 of Title 10.
**(15)** Any person or entity engaged in the business of conveyance of accounts receivable, under Act No. 8 of October 8, 1954.
**(16)** Any person or entity that does business under the Uniform Trust Receipt Transactions Act, Act No. 3, approved October 13, 1954.
**(17)** The Commonwealth of Puerto Employees Association, created by §§ 862 et seq. of Title 3, regarding the businesses that are bound by the duty of inspecting and supervising of the Office of the Commissioner.

Private Equity Funds. It is well settled that an administrative agency may not, by regulation, amend or enlarge the statute from which it derives its authority.

While certain statutes permit liquidation in limited circumstances, none authorize the appointment of an operational receiver to displace management and assume control of the entity's affairs. The contrast is dispositive: where the Legislature intended to confer receivership authority, it did so expressly—such as in the context of international financial entities. Its deliberate omission of that power with respect to private capital funds forecloses any attempt to create it by regulation.

Accordingly, any attempt to "tag along" receivership powers from such an invalid expansion is necessarily *ultra vires,* and void *ab initio* and cannot serve as a lawful predicate for displacing the Debtor's management or altering governance under the Bankruptcy Code.

The structural defect is further illustrated by the role assigned to the purported receiver itself. As reflected in the administrative proceedings, Driven simultaneously functions as examiner, proponent of adverse findings, and proposed receiver, while also attempting to displace the Debtor's independent counsel.

This collapses the distinction between investigator, advocate, and decision-maker, and results in a process in which the same entity seeks to control the Debtor while validating the basis for that control. Such a framework is incompatible with basic principles of due process and further underscores that the receivership is not a lawful regulatory measure, but an ultra vires takeover of the Debtor's governance.

These defects are not technical. They go to the core of OCIF's asserted authority. OCIF's theory assumes the validity of a receivership power it does not possess and then seeks to project that unlawful administrative act into the bankruptcy context to displace the Debtor's

12

management. But an *ultra vires* administrative action cannot serve as a lawful predicate for altering the governance of a debtor-in-possession under the Bankruptcy Code.

### 2. *The due process violations in the administrative proceedings further underscore the likelihood of success.*

The record also reveals a fatal procedural breakdown. TPFA, the entity that filed the Notice of Appeal on behalf of the Debtor and whose management role was displaced by the Receivership Order, was not properly brought into the administrative proceeding before OCIF. That omission is not incidental. It strikes the heart and most basic fundamental right of due process. A party cannot be stripped of its functional role and legal interests through an adjudicative process in which it was not properly cited and afforded a meaningful opportunity to be heard.

The structural defect became even more acute when, on March 12, 2026, attorneys for Driven, acting under the color of its alleged interim designation as receiver, requested that the Fund's counsels resign from representing the Fund in the administrative and judicial proceedings. That action starkly illustrates the constitutional problem. The same entity that was advocating for control of the Fund was also attempting to eliminate the Fund's independent legal representation, thereby depriving the Fund of a meaningful defense against OCIF and Driven's own efforts to entrench the receivership. That is antithetical to basic due process. No adjudicative system can be regarded as fair when the would-be receiver seeks simultaneously to control the entity, displace its management, and silence its chosen counsel.

These facts are especially important on appeal because they expose the Order's practical effect: the Court did not simply recognize an existing managerial reality; it effectively empowered a contested, interim, and unauthorized receiver to extinguish the Debtor's independent capacity to defend itself. An appellate court is likely to regard that result as both

procedurally intolerable and incompatible with chapter 11.

### 3. Federal law controls the debtor-in-possession determination.

OCIF's reliance on Puerto Rico statutes does not change the governing inquiry. The question is who constituted the debtor-in-possession under 11 U.S.C. § 1101(1) on the Petition Date. That is a question of federal bankruptcy law. And under federal law, TPFA, as the Fund's Manager, filed the petition on behalf of the Debtor in the exercise of that authority. Puerto Rico law cannot redefine who is the debtor-in-possession for purposes of chapter 11, nor can an interim administrative order override the Code's requirements for displacing existing management.

Indeed, even if Puerto Rico law were relevant to the background analysis, it would not assist OCIF because, as noted, OCIF lacked authority to impose the very operational receivership on which it relies. The argument therefore fails twice: federal law governs the debtor-in-possession question, and the local-law predicate on which OCIF relies is itself unlawful and unfinished.

As the Supreme Court has made clear, "[n]o matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. Federal Communications Commission*, 569 U.S. 290 (2013).

### 4. The Bankruptcy Code requires actual control – not designation.

Section 1101(1) of the Code defines the debtor-in-possession as the "debtor." When the debtor is an entity, Rule 9001(5)(A) identifies the debtor as any "person in control." The operative phrase is "in control" - not "designated," not "authorized," not "appointed." The statute demands a factual predicate. The question is not who an administrative order purported

14

to appoint, but who actually controlled the Debtor's business and affairs when the chapter 11 case commenced.

The undisputed record, drawn from OCIF's own filings, answers the question. Three admissions are dispositive. First, "[Driven] obtained no possession of any physical assets of the Fund." (ECF No. 14, ¶ 38). Second, "[Driven] was not granted any information about any bank accounts of the Debtor." (Id. ¶ 39). Third, Driven "was ultimately only granted access (after several failed attempts) to the Fund's cloud-based system" on February 19, 2026 - four days before the Petition Date. (Id. ¶ 40). No operational control. No asset possession. No Financial access. No management authority. Driven had five days between the Receivership Order and the Petition Date, and all it accomplished was access to a document repository. Browsing files on a server is not running a business, and it is certainly not managing a debtor-in-possession.

On the other side of the ledger, the President authorized, executed, and filed the voluntary petition on the Petition Date "in the exercise of full corporate authority." (ECF No. 1 at 4). He did so because he was the person managing the Fund's affairs. He was the "person in control" within the meaning of Rule 9001(5)(A). The Debtor's existing management constitutes the debtor-in-possession under Section 1101(1).

The Administrative Order improperly substituted a formal, label-based approach for the fact-specific inquiry the Code requires. It treated the Receivership Order's purported grant of authority as if it established actual control. But the Code does not turn on who was nominally designated to control the debtor—it turns on who was in control when the petition was filed. That distinction is dispositive here.

### 5. OCIF's theory would nullify § 1104

The structural consequences of sustaining the Order underscore the magnitude of the error. If an administrative receivership order sufficed to override Section 1101(1), then any regulator in any jurisdiction could render Section 1104 a dead letter simply by issuing an appointment on the eve of a bankruptcy filing.

Section 1104 is the exclusive mechanism the Code provides for displacing a debtor-in-possession.   It requires notice, a hearing and an evidentiary showing of cause - "fraud, dishonesty, incompetence, or gross mismanagement" –  or a showing that displacement is in the interests of creditors, equity holders, and the estate.  11 U.S.C. § 1104(a)(1)-(2).  It further requires proof by clear and convincing evidence.  See In re G-I Holdings, Inc., 295 B.R. 502, 508 (D.N.J. 2003), aff'd, 385 F.3d 313 (3d Cir. 2004).

Courts apply a strong presumption against appointment because "it is settled that appointment of a trustee should be the exception, rather than the rule" - existing management is "generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." Id. (quoting In re Marvel Ent. Grp., Inc., 140 F.3d 463, 471 (3d Cir. 1998)).

OCIF satisfied none of these requirements.  It did not file a Section 1104 motion. It did not establish cause.  It did not make an evidentiary showing.  It did not submit to the procedural requirements Congress prescribed.

The Receivership Order effectively permitted OCIF to achieve through administrative fiat what Section 1104 requires a court to determine after rigorous procedural safeguards.  That is not how the Code operates and a reviewing court is likely to say so.

This error is structural, not technical.  If an interim and unexecuted administrative receivership order were sufficient to displace existing management, § 1104 would become

16

meaningless.  Any regulator could preempt the Bankruptcy Code's carefully constructed framework simply by issuing a receivership order on the eve of bankruptcy and invoking it as a substitute for judicial process.  That is precisely what the Code forbids.

Section 1104 reflects the settled principle that existing management remains in place absent a demonstrated basis for judicial displacement. OCIF bypassed that framework entirely. Instead of invoking § 1104, it asked the Bankruptcy Court to give federal effect to an interim administrative mechanism and thereby evade the safeguards Congress made mandatory.  That approach cannot be reconciled with the structure of chapter 11.

In its Opinion and Order, The Bankruptcy Court permitted OCIF to accomplish through administrative fiat what federal law reserves for judicial determination under § 1104. That is reversible error.

**6. *The authorities relied upon by OCIF confirm, rather than undermine, the Debtor's position.***

Every case OCIF relied upon involved a receiver who had already assumed actual control, operational control of the debtor entity before any petition was filed.

In In re Bayou Group, LLC, 564 F.3d 541, 545-46 (2d Cir. 2009), the receiver had functioned as the exclusive managing member of the debtor entities for an extended period before the bankruptcy. He managed assets.  He directed operations.  He served as the sole decision-maker. The Second Circuit recognized his status as debtor-in-possession because he was already the "corporate governor" of the entities. Id. at 545.

The district court below had been explicit: the receiver was "the exclusive managing member of a debtor-in-possession" who was "subject to all of the obligations imposed on such entities by the Bankruptcy Code." In re Bayou Grp., LLC, 363 B.R. 674, 688 (S.D.N.Y. 2007).

Bayou did not hold that any entity holding an unexecuted administrative receivership order qualifies as debtor-in-possession.  It held that a receiver who has already assumed actual management qualifies.  The distinction is dispositive.

The Southern District of New York followed the same logic in S.E.C. v. Byers, 592 F. Supp. 2d 532, 534 (S.D.N.Y. 2008).  There, the receiver had actual authority over the entities, had marshaled information concerning their financial condition, exercised control over assets, and was functioning as the operative decisionmaker at the time of the bankruptcy filing. The court's reasoning turned on that factual reality.

Here, by contrast, Driven had not taken possession of assets, had not assumed financial control, had not completed any meaningful operational takeover, and did not decide to file the bankruptcy petition. The President did.

The principle these cases establish - and the principle the appellate court will apply - is straightforward: a receiver becomes the debtor-in-possession when, and only when, the receiver is the person in actual control at the time the case commences.

An order that purports to confer control is not the same as controlled actually exercised. Rule 9001(5) operate on facts, not aspirations.  The distinction is operative.

### 7. *The Enforcement Action Fails Both Tests for the Police Power Exception.*

The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." Midatlantic Nat'I Bank v. NJDEP, 474 U.S. 494, 503 (1986). It "provides for a broad stay of litigation, lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims." 3 COLLIER ON BANKRUPTCY, ¶ 362.01 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2018). Section 362(a)(1) stays the commencement or continuation of any administrative action against the debtor. Section

18

362(a)(3) stays any act to obtain possession of estate property or to exercise control over estate property. The Enforcement Action triggers both provisions.

Section 362(b)(4) creates a narrow exception for governmental actions to enforce police or regulatory power. The exception is narrowly construed and applies only to actions that protect health and safety, not those that seeks control over estate property or distribution. OCIF's Enforcement Action fall on the prohibited side of the line.

The First Circuit applies two "interrelated, fact-dominated inquiries" to determine whether the exception applies: the pecuniary purpose test and the public policy test. *In re Ruiz*, 122 F.4th 1, 14 (1st Cir. 2024); *McMullen v. Sevigny* (*In re McMullen*), 386 F.3d 320, 325 (1st Cir. 2004). Both tests look at what the government actually does, not how the government labels it. Under either test, OCIF's Enforcement Action fails.

Under the pecuniary purpose test, the exception does not apply where the action primarily relates to estate property rather than public safety. *McMullen*, 386 F.3d at 325; *Ruiz*, 122 F.4th at 16 ("a pecuniary interest of the government itself cannot be the primary purpose of the government's action").

OCIF insists that the Receivership Order seeks no pecuniary interest for OCIF itself. But that argument entirely misses the point. The Order imposes no fine, revokes no license, and compels no compliance. Its operative function is liquidation. The Receiver is empowered to seize and dispose of assets, replace bank signatories, freeze accounts, pursue clawbacks, establish a claims bar date, adjudicate claims, and prepare a liquidation and distribution report. Those are not incidental features; they are the core of the Order. The objective is to convert estate assets into cash and distribute them. That is quintessentially pecuniary, regardless of whether OCIF itself receives the proceeds.

Under the public policy test, the exception applies only where the action effectuates public policy rather than adjudicating private rights.  Here the Enforcement Action does the opposite.  It does not establish or enforce regulatory standards. It adjudicates claims, marshals assets, and distributes proceeds among creditors.  In substance and effect, the Enforcement Action is a parallel liquidation proceeding operating outside the Bankruptcy Code. It therefore fails both tests and falls outside § 362(b)(4).

**B.    THE DEBTOR WILL SUFFER IRREPARABLE HARM ABSENT A STAY.**

In the present case irreparable harm is not a theoretical possibility.  It is the inevitable and immediate consequence of allowing the Receivership Order to take effect without a stay. An appellate court cannot unscramble a liquidated estate; once liquidation occurs, appellate review becomes meaningless.

The appellate court will be left with *a fait accompli*—an appeal from an order that has already been executed in full. Appellate review in such circumstances is illusory. See *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) ("*an appeal is moot where no meaningful relief can be granted*").

Without a stay, Driven, now recognized as debtor-in-possession, will exercise exclusive control over the estate and may proceed with actions, including liquidation, that will irreversibly alter the estate before appellate review can occur, rendering this appeal effectively moot.  The harm arises not from the continuation of the bankruptcy case, but from the transfer of control over that case to a contested and unauthorized receiver.

The harm is structural and immediate. The Order transfers control of a $500 million estate from the Debtor's management to a purported receiver, now recognized as debtor-in-possession, based on an interim and contested administrative receivership, with authority to

seize assets, replace bank signatories, adjudicate claims, and distribute proceeds. Once those actions occur, they cannot be undone. No subsequent ruling can reconstruct the estate, unwind distributions, or restore the Debtor's governance.

At the same time, the liquidation will extinguish the Debtor's core federal right to reorganize under Chapter 11. A Chapter 11 case in which control has been transferred to an unauthorized or conflicted debtor-in-possession cannot function as Congress intended and cannot meaningfully pursue reorganization. That loss is final. It will occur before appellate review and cannot be remedied after the fact.

As demonstrated above, OCIF's lack of statutory authority to impose an operational receivership over a private capital fund, rendering the Receivership Order ultra vires and without legal foundation.

A debtor-in-possession stripped of its assets, contracts, governance, and operational authority cannot reorganize. It cannot propose a plan or exercise any of the protections afforded by Chapter 11 of the Bankruptcy Code. The Debtor's federally granted right to reorganize will be extinguished, before it can be reviewed on appeal.

The irreparable nature of this harm is compounded by fundamental violations of due process that are actively unfolding. On March 12, 2026, Driven - purporting to act as interim receiver - requested that the Fund's attorneys resign from representing the Debtor in both administrative and judicial proceedings. This is a structural breakdown of the adversarial process. The same entity that seeks to control the Debtor's assets and operations is simultaneously attempting to eliminate its legal representation. The Debtor is thus placed under the control of an adverse party while being deprived of any legal defense. This eliminates any meaningful opportunity to be heard. No later court order can restore a lost defense,

21

reconstruct a tainted record, or cure a process in which one party controlled both prosecution and defense.

At the same time, OCIF's actions rest on a jurisdictional foundation that has already collapsed. The Debtor's status as a private capital fund under Act 60 was revoked on March 12, 2026, eliminating the very statutory framework upon which OCIF's asserted authority depends. OCIF has not identified no alternative jurisdictional basis.  Is ongoing actions are therefore void.

Allowing an *ultra vires* liquidation to proceed is the definition of irreparable harm. Once assets are sold, contracts terminated, and distributions made under a void process, no court can reconstruct the estate or restore the parties to their pre-liquidation positions. The harm is permanent.

The Debtor's right to reorganize under Chapter 11 is a substantive federal right. Its nullification, through an unauthorized, liquidation process carried out before appellate review, constitutes paradigmatic irreparable injury.  No monetary damages can compensate for the destruction of a bankruptcy estate. No subsequent ruling can unwind asset transfers, revive terminated contracts, or restore governance once displaced by an unauthorized receiver. See *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997) ("*irreparable harm exists where there is no adequate remedy at law*").

The harm extends beyond the Debtor to its creditors and investors. The Bankruptcy Code guarantees them notice, participation, voting rights, and judicial oversight.  OCIF's process replaces those protections with a unilateral mechanism it controls.  Those determinations cannot be undone.

In sum, the absence of a stay will permit (i) the immediate and irreversible liquidation

of the estate, (ii) the destruction of the Debtor's federal right to reorganize, (iii) the continuation of proceedings conducted without jurisdiction, (iv) the perpetuation of a process that violates fundamental due process by stripping the Debtor of legal representation, and (v) the elimination of meaningful appellate review.

Under these circumstances, the irreparable harm factor does not merely favor a stay— it compels it.

### C. A STAY WILL NOT SUBSTANTIALLY HARM OTHER PARTIES.

Maintaining the *status quo* does not harm OCIF. It does not harm creditors. It does not harm investors. It preserves the $500 million estate under the supervision of a federal bankruptcy court - exactly where Congress intended it to be.

The Code already provides every protection OCIF claims to seek. As debtor-in possession, the Fund's management owes fiduciary duties to all creditors and parties in interest under Sections 1107(a) and 1106- including the obligation to file reports, account for property, investigate the debtor's financial affairs, and comply with orders of this Court. The United States Trustee exercises independent oversight over every Chapter 11 case.

Creditors receive notice under Bankruptcy Rule 2002, disclosure under Section 1125, the right to file claims under Sections 501 and 502, the right to vote on any plan under Section 1126, and the right to be heard before this Court on any matter affecting their interests. No party in interest goes unprotected. The Code is a comprehensive system of checks, and each one applies with full force.

OCIF's regulatory authority is not impaired by the stay. The automatic stay does not prevent OCIF from investigating the Fund, issuing findings, imposing fines, revoking licenses, pursuing cease and desist orders, or taking any other regulatory action within its mandate. What

23

the stay prevents - and what OCIF actually seeks - is the unilateral liquidation of the estate by a state-appointed receiver and recognized through the Order. That is not a regulatory interest the stay was ever designed to accommodate. It is the precise overreach the stay was designed to prevent.

If OCIF believes that existing management should be displaced, the Code provides the remedy: a motion under Section 1104. If OCIF has concerns about the preservation of assets, the Code provides protective orders, reporting requirements, and the fiduciary obligations imposed on every debtor-in-possession. If OCIF wishes to participate in the administration of the estate, the Code guarantees it standing as a party in interest. Every concern OCIF has raised in this case can be addressed through the mechanisms Congress provided. OCIF has pursued none of them. Its insistence on bypassing the Code's protections is not evidence of harm. It is evidence that the Code's protections are exactly what OCIF wishes to avoid.

Creditors and investors - the very parties OCIF claims to protect - are better served by the stay, not harmed by it. Under the Code, they receive notice, disclosure, a vote on any plan, the right to be heard, and the protection of judicially supervised administration. Under the Receivership Order, they receive whatever OCIF's administrative process provides - a process designed and controlled by OCIF, with disputes resolved by OCIF itself. (Receivership Order § VIII.B.21 (d)-(e)). No rational creditor prefers a system administered by the regulator over a system administered by a federal court. The stay harms no one, it protects everyone.

### D. THE PUBLIC INTEREST FAVORS A STAY.

The public interest in this case is not abstract. It is the interest in preserving the fundamental architecture of Chapter 11 and the supremacy of federal bankruptcy law over state administrative proceedings that seek to displace it.

24

The Bankruptcy Clause of the Constitution vests Congress with the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. 1, § 8, el. 4. Congress exercised that power by enacting the Code - a comprehensive federal statutory scheme that governs the administration of insolvent estates, prescribes the rights of debtors, creditors, and vests jurisdiction in the bankruptcy courts. The Order permits a state administrative agency to displace that system wholesale - to conduct a parallel insolvency proceeding entirely outside the Code.

The public interest in uniform bankruptcy administration is not served by allowing a state regulator to operate a Chapter 7 liquidation - complete with a liquidating receiver, a claims process, avoidance powers, creditor committees, and a distribution plan - outside the Code and beyond the reach of this Court. If one state agency can do it, every state agency can do it. The implications for the bankruptcy system are enormous. Every regulated entity that files for Chapter 11 would face the prospect of a competing administrative liquidation, conducted by whatever regulator claims jurisdiction, applying whatever procedures the regulator devises, under whatever standards the regulator imposes. That is the antithesis of the uniform system Congress designed.

The stay preserves the *status quo.* It maintains the estate under this Court's jurisdiction. It ensures that the appellate court has the opportunity to review the questions the Order raises on a full record, with the benefit of full briefing, without confronting the irreversible *fait accompli* of a liquidated estate. And it ensures that whatever the appellate court decides, its decision will have meaning - because there will still be an estate to administer, rights to protect, and a case to resolve.

The stakes extend beyond this case. Puerto Rico's regulatory framework is not unique.

25

Virtually every state maintains agencies with regulatory authority over financial institutions, insurance companies, securities firms, and other entities. Many of those agencies possess authority to appoint receivers. If the police power exception permits one such agency to displace a federal bankruptcy case with a liquidation process initiated through an administrative receivership, then every such agency can do the same. The result would be a patchwork of competing state administrative insolvency regimes, each claiming primacy over the Code whenever a regulated entity files for Chapter 11. That result is incompatible with the constitutional mandate of uniformity - and incompatible with the federal scheme Congress enacted to fulfill it. The public interest demands that the Order be stayed until the appellate court can assess whether the Code permits what OCIF has done.

The Debtor does not ask this Court to reverse itself. It asks this Court to pause - to preserve the possibility that a reviewing court will conclude that the statutory text, the case law, and the structural design of Chapter 11 compel a different result.

That is precisely the function a stay pending appeal is designed to serve. The public interest demands nothing less.

## V.     CONCLUSION

All four factors favor the Debtor. The appeal raises questions of statutory interpretation - questions about the meaning of "in control" under Section 1101(1), the scope of the police power exception under Section 362(b)(4), the exclusivity of Section 1104's displacement mechanism, and the relationship between state regulatory receiverships and federal bankruptcy jurisdiction. A reviewing court is likely to resolve each in the Debtor's favor. Without a stay, the Debtor will suffer irreparable harm that no appellate remedy can cure: the liquidation of a $500 million estate in an administrative forum lacking every protection Congress built into the

Code. OCIF suffers no harm from a stay; the estate remains under the supervision of this Court, subject to the fiduciary obligations, transparency requirements, and independent oversight the Code provides. And the public interest demands preservation of the federal bankruptcy system's supremacy over state administrative overreach.

**WHEREFORE,** the Debtor respectfully requests that this Court: (1) stay the Order pending appeal pursuant to Federal Rule of Bankruptcy Procedure 8007; (2) require OCIF and Driven to maintain the *status quo* pending the appeal's resolution; and (3) grant such other and further relief as this Court deems just and proper.

**CERTIFICATE OF SERVICE:** It is hereby certified that on this date, a true and correct copy of the foregoing Notice of Appeal and Statement of Election, together with the Opinion and Order dated March 11, 2026 (**Exhibit 2**), was electronically filed through the CM/ECF system of the United States Bankruptcy Court for the District of Puerto Rico. The system will generate a Notice of Electronic Filing to all counsel of record and registered participants in this case.

Guaynabo, Puerto Rico, March 25th, 2026

RGTLAW, LLC

**RAUL GONZALEZ TORO LAW OFFICES, LLC**
#27 Calle González Giusti, Suite 302
Guaynabo, PR 00968-3037

PO Box 270343
San Juan, PR 00928-0343
Telephone: (787) 753-6090
Email: rgt@rgtlawpr.com; rgtlaw@ymail.com

*/s/ Raúl González-Toro*
Raúl González Toro, Esq.
USDC-PR No.

27