## ADVISORY AGREEMENT

**THIS ADVISORY AGREEMENT**, dated as of April 4, 2018, is between **THE PHOENIX FUND LLC.**, a limited liability company organized under the laws of the Commonwealth of Puerto Rico (the "Company"), and **THE PHOENIX FUND ADVISOR LLC**, a limited liability company organized under the laws of the Commonwealth of Puerto Rico (the "Advisor").

## W I T N E S S E T H:

WHEREAS, the Company plans to raise capital through private placements of membership interests;

WHEREAS, the Company has elected to operate as a Puerto Rico Private Equity Fund (as defined below), and invest its funds in Investments as permitted under Act No. 185 of November 12, 2014, also known as the "Puerto Rico Private Equity Funds Act;"

WHEREAS, the Company desires to avail itself of the experience, sources of information, advice, assistance and facilities available to the Advisor and to have the Advisor undertake the duties and responsibilities hereinafter set forth on behalf of the Company, all as provided herein; and

WHEREAS, the Advisor is willing to undertake to render such services on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1.      **Definitions**.  As used in this Agreement, the following terms have the definitions hereinafter indicated:

Advisory Board. The Fund's Advisory Board.

Affiliate. With respect to any specified Person (i) any Person directly or indirectly controlling or controlled by, or under common control with, the specified Person, (ii) any officer, director, partner or trustee of the specified Person or any Person of which the specified Person is an officer, director, general partner or trustee, and (iii) any Person owning or controlling 10% or more of the outstanding voting securities or beneficial interests of the specified Person.

Cause. With respect to the termination of this Agreement means fraud, criminal conduct, willful misconduct, or material breach of this Agreement by the Advisor.

Certificate of Formation. The Certificate of Formation of the Company, as amended, supplemented, corrected or restated from time to time, pursuant to which the Company is organized.

Code. The U.S. Internal Revenue Code of 1986, as amended.

Good Reason. With respect to the termination of this Agreement means (i) any failure to obtain a satisfactory agreement from any successor to the Company to assume and agree to perform the Company's obligations under this Agreement; or (ii) any material breach of this Agreement of any nature whatsoever by the Company.

Incentive Fee. The Incentive Fee as set forth in Section 9(b).

Investment Expenses. Includes (i) those expenses, including but not limited to legal fees and expenses, travel and communications expenses, costs of third-party appraisals and analyses, nonrefundable option payments on investments not made, commitment fees, accounting fees and expenses, insurance and miscellaneous expenses related to the making of Investments, whether or not such Investments are ultimately acquired, and (ii) all fees and commissions paid to any party (other than the Advisor) in connection with the making of Investments by the Company. Included in the computation of such fees or commissions shall be any third-party commissions, debt placement fees, transaction structuring fees or a third-party fees of a similar nature, however designated, and paid to a third party.

Investments. Any investments that a private equity fund may make under the Private Equity Funds Act, including, but not limited to, Loans, notes, debt instruments, stocks, preferred equity, and common equity, issued by companies or other entities that are not publicly traded, and including companies whose only asset is real estate.

Loans. The notes and other evidences of indebtedness or obligations acquired or entered into by the Company as lender which may be secured by pledge or guaranty or collateralized by personal property or fee or leasehold interests in real estate or other assets, including, but not limited to, first or subordinate mortgage loans, construction loans, development loans, working capital loans, loans secured by capital stock or any other assets or form of membership interest and any other type of loan or financial arrangement, such as providing or arranging for letters of credit, providing guarantees of obligations to third parties, or providing commitments for loans. The term "Loans" shall not include leases which are not recognized as leases for Puerto Rico or federal income tax reporting purposes.

Management Fee. The Management Fee as set forth in Section 9(a).

Members. Those Persons who at any particular time are shown as holders of record of Membership Interests on the books and records of the Company.

Membership Interests. All the Membership Interests of the Company.

Memorandum. The most recent private placement memorandum of the Company prepared in connection with any Offering of Membership Interests.

Offering. An offering of Membership Interests in the Company.

Operating Agreement. The Company's Limited Liability Company Operating Agreement dated as of April 4, 2018.

Operating Expenses. All expenses paid or incurred by the Company or the Advisor relating to the operation and administration of the Company, including the fees and expenses of the Advisory Board, legal, auditing, accounting and other professional fees and expenses, and all other operating and administrative expenses, except the following: (i) interest and discounts and other costs of borrowed money; (ii) taxes (including Puerto Rico, U.S. state and federal income taxes, property taxes and assessments, franchise taxes and taxes of any other nature); (iii) expenses of raising capital, including Organizational and Offering Expenses, printing, engraving, and other expenses, and taxes incurred in connection with the issuance, distribution and transfer of the Company's Membership Interests; (iv) expenses connected with the acquisition, and disposition of Investments or debt collection; and (v) non-cash items, such as depreciation, amortization, depletion, and additions to reserves for depreciation, amortization, depletion, losses and bad debts.

Organizational and Offering Expenses. Those expenses payable by the Company or the Advisor in connection with the formation, qualification and registration of the Company and in marketing and distributing Membership Interests of the Company, including, but not limited to (i) the preparing, printing, filing and delivery of a Private Placement Memorandum (including any amendments thereof or supplements thereto) and the preparing and printing of agreements between the Company, any Placement Agent and any Selected Dealers, (ii) the preparing and printing of the organizational documents, including Certificate of Formation and Operating Agreement, and the filing or recording of documents necessary to comply with the laws of the Puerto Rico and the United States for the formation of the Company and thereafter for the continued good standing of the Company, (iii) the exemption, qualification or registration of Membership Interests in the Company under Puerto Rico, U.S. federal and state securities laws, (iv) any escrow arrangements, including any compensation to an escrow agent, (v) the fees of the Company's counsel and independent public accountants, (vi) all sales literature, and (vii) selling commissions, allowances and other expenses incurred in connection with the private placement of Membership Interests of the Company.

Person. An individual, corporation, partnership, joint venture, association, limited liability company, trust, bank or other entity, or government or any agency or political subdivision of a government.

Placement Agent. Any registered broker dealer or registered investment advisor with whom the Company contracts to offer Membership Interests of the Company pursuant to an Offering.

Selected Dealers. Broker-dealers and investment advisors who are members of the Financial Industry Regulatory Authority and who execute an agreement with either a Placement Agent or the Company in which they agree to participate with the Placement Agent in an Offering.

Termination Date. The effective date of termination of this Agreement, determined in accordance with Section 14.

2.     **Appointment**. The Company hereby appoints the Advisor to serve as its investment advisor on the terms and conditions set forth in this Agreement, and the Advisor hereby accepts such appointment.

3.      **Duties of the Advisor**. The Advisor undertakes to use its best efforts to present to the Company potential Investments and to provide a continuing and suitable investment program consistent with the investment objectives and policies of the Company as determined from time to time by the Manager with the advice of the Advisory Board. In performance of this undertaking and consistent with the provisions of the most recent Memorandum used by the Company, the Certificate of Formation and the Operating Agreement, the Advisor shall, either directly or by engaging an Affiliate:

(a)      serve as the Company's investment adviser and financial advisor and provide research and economic and statistical data in connection with the Company's assets and investment policies;

(b)      act as managing member of the Company in accordance with the terms of the Operating Agreement;

(c)      provide for the daily management of the Company and perform and supervise the various administrative functions reasonably necessary for the management of the Company;

(d)      investigate, select and, on behalf of the Company, engage and conduct business with such Persons as the Advisor deems necessary to the proper performance of its obligations hereunder, including, but not limited to, consultants, accountants, correspondents, lenders, technical advisors, attorneys, brokers, underwriters, corporate fiduciaries, escrow agents, depositories, custodians, agents for collection, insurers, insurance agents, banks, builders, developers, property owners, mortgagors, and any and all agents for any of the foregoing, including Affiliates of the Advisor, and Persons acting in any other capacity deemed by the Advisor necessary or desirable for the performance of any of the foregoing services, including, but not limited to, entering into contracts in the name of the Company with any of the foregoing;

(e)      consult with the Advisory Board in the formulation and implementation of the Company's financial policies, and, as necessary, furnish the Advisory Board with advice with respect to the investment objectives and policies of the Company;

(f)      (i) locate, analyze and select potential Investments; (ii) structure and negotiate the terms and conditions of transactions pursuant to which Investments will be made; (iii) make Investments on behalf of the Company in compliance with the investment objectives and policies of the Company; and (iv) arrange for financing, and refinancing and make other changes in the asset or capital structure of, and dispose of, reinvest the proceeds from the sale of or otherwise deal with the Investments;

(g)      provide the Advisory Board with periodic reports regarding prospective Investments for the Company;

(h)      make on behalf of the Fund any required filings with government authorities, and take on behalf of the Fund any actions required to ensure continued compliance by the Fund with Act 185;

-4-

(i)     negotiate on behalf of the Company with banks and other lenders for loans to be made to the Company, and negotiate on behalf of the Company with investment banking firms, Placement Agents and Selected Dealers or negotiate private sales of securities or obtain loans for the Company, but in no event in such a way so that the Advisor shall be acting as broker-dealer or underwriter; and provided, further, that any fees and costs payable to third parties incurred by the Advisor in connection with the foregoing shall be the responsibility of the Company;

(j)     whenever the Advisor shall determine it to be appropriate or required by law, rule or regulation, obtain reports (which may be prepared by the Advisor or its Affiliates), concerning the value of Investments or contemplated Investments;

(k)     obtain for, or provide to, the Company such services as may be required in acquiring, managing and disposing of Company assets, including, but not limited to (i) the negotiation, making and servicing of Loans; (ii) the disbursement and collection of Company monies; (iii) the payment of debts of and fulfillment of the obligations of the Company; and (iv) the handling, prosecuting and settling of any claims of or against the Company, including, but not limited to, foreclosing and otherwise enforcing mortgages and other liens securing Loans;

(l)     from time to time, or at any time reasonably requested by the Advisory Board, make reports to the Advisory Board of its performance of services to the Company under this Agreement;

(m)     prepare or retain third parties to prepare the reports required to be provided to Members pursuant to Act 185, and communicate on behalf of the Company with Members as required to satisfy the reporting and other requirements of any governmental bodies or agencies to Members and third parties and otherwise as requested by the Company;

(n)     provide or arrange for administrative services and items, legal and other services, office space, office furnishings, personnel and other overhead items necessary and incidental to the Company's business and operations;

(o)     provide the Company with such accounting data and any other information so requested concerning the investment activities of the Company as shall be required to prepare and file all periodic financial reports, including annual financial statements, and returns required to be filed with any regulatory agency and to distribute such reports and other information to the Membership Interest holders at the Company's request;

(p)     maintain the books and records of the Company;

(q)     supervise the performance of such ministerial and administrative functions as may be necessary in connection with the daily operations of the Company's Investments;

(r)     provide the Company with all necessary cash management services;

(s)     do all things necessary to assure its ability to render the services described in this Agreement;

(t) perform such other services as may be required from time to time for management and other activities relating to the assets of the Company as the Advisor shall deem advisable under the particular circumstances;

(u) notify the Advisory Board of all proposed transactions before they are completed.

4. **Authority of Advisor**. Subject to the other terms of this Agreement (including the restrictions included in this Section 4 and in Section 7), the Company hereby delegates to the Advisor the authority to (i) locate, analyze and select Investments, (ii) structure the terms and conditions of transactions pursuant to which Investments will be made or acquired for the Company, (iii) make Loans in compliance with the investment objectives and policies of the Company, (iv) arrange for financing or refinancing, or make changes in the asset or capital structure of, dispose of or otherwise deal with the Company's assets, (v) oversee third-party service providers and other Persons who perform services for the Company, (vi) undertake accounting and other record-keeping functions, (vii) determine the composition of the Fund's investment portfolio, the nature and timing of the changes to its portfolio and the manner of implementing such changes, (vii) negotiate the structure of the Fund's investments, (viii) execute, close, service and monitor the investments of the Fund, (viii) determine the securities and other assets that the Fund purchases, retains or sells, (ix) perform due diligence on prospective investments and financings, (x) represent the Fund at management or board of directors meetings of  companies in which the Fund invests (referred to as "portfolio companies"), (xi) pledge Fund assets and borrow money on behalf of the Fund, and (xii) provide the Fund with such other investment advisory, research and related services as the Fund may reasonably require for the investment of its funds. The Advisor may receive and retain fees, for its account and not for the account of the Fund, from prospective portfolio companies or borrowers in the form of application fees or other engagement and structuring fees related to the due diligence of potential investment opportunities.

5. **Bank Accounts**. The Advisor may establish and maintain one or more bank accounts in its own name for the account of the Company or in the name of the Company, and may collect and deposit into any such account or accounts, and disburse from any such account or accounts, any money on behalf of the Company, under such terms and conditions as the Advisor may determine; provided that no funds shall be commingled with the funds of the Advisor and the Advisor shall from time to time render appropriate accountings of such collections and payments to the Company and to the auditors of the Company.

6. **Records; Access**. The Advisor shall maintain appropriate records of all its activities hereunder and make such records available for inspection by counsel, auditors and authorized agents of the Company, at any time or from time to time during normal business hours. The Advisor shall at all reasonable times have access to the books and records of the Company.

7. **Limitations on Activities**. Anything else in this Agreement to the contrary notwithstanding, the Advisor shall refrain from taking any action which, in its sole judgment made in good faith, would adversely affect the status of the Company as a Puerto Rico Private Equity Fund, would subject the Company to regulation under the Investment Company Act of 1940, would violate any law, rule, regulation or statement of policy of any governmental body or agency

having jurisdiction over the Company, or otherwise would not be permitted by the Certificate of Formation or the Operating Agreement.

Notwithstanding the foregoing, the Advisor, its partners and employees, and partners, members, directors and officers of the Advisor's partners shall not be liable to the Company, or to the Advisory Board or to Members of the Company for any act or omission by the Advisor, its partners or employees, or partners, members, directors or officers of the Advisor's partners except to the extent that such person shall have been determined to have acted in bad faith or with gross negligence by a final judgement of a court of competent jurisdiction.

8. **Relationship with Advisory Board**. Partners, members, shareholders, offices, directors and employees of the Advisor or of its Affiliates may serve as a members of the Advisory Board.

9. **Fees.**

(a) **Management Fee.** The Company will pay the Advisor a management fee (the "Management Fee") payable quarterly in arrears on the first day of January, April, July and October of each year, at a rate of 2.00% per annum of the weighted average amount of capital contributed or committed to the Company (whether or not paid), calculated for the preceding three months. The Management Fee will begin to accrue as of the date of the initial sale of Membership Interests and will be prorated for any partial period.

(b) **Incentive Fee.** The Company will pay the Advisor an incentive fee (the "Incentive Fee"), calculated and payable in arrears with respect to each fiscal year, within 30 days of the end of the fiscal year. The Incentive Fee shall be equal to 20% of the Company's Incentive Fee Distributions (as defined below) for each fiscal year and will be payable with respect to a Member only if such Member receives an annualized return of at least 8% (the "Hurdle Rate") for such fiscal year on the weighted average capital actually contributed to the Company by such Member, calculated on a monthly basis. Once a Member's annualized return for the year equals the Hurdle Rate, all cash distributions that would otherwise be payable to such Member for such year if such distributions were payable solely on the basis of the capital contributed by each Member and the other factors referred to in the Operating Agreement shall be paid to the Advisor until the Advisor has received an amount equal to the amount which would have been paid as Incentive Fee with respect to such Member had the Hurdle Rate been 0%. This portion of the Incentive Fee is referred to as the "Contingent Incentive Fee." After receiving the Contingent Incentive Fee with respect to a fiscal year, all cash distributions that would otherwise be payable to such Member for such year if such distributions were payable solely on the basis of the capital contributed by each Member and the other factors referred to in the Operating Agreement will be distributed 80% to such Member and 20% to the Advisor as payment of the balance of the Incentive Fee for such fiscal year. The Hurdle Rate and the Incentive Fee for each fiscal year and for each Member will be calculated solely on the basis of the Incentive Fee Distributions of the Company to such Member for such fiscal year. Accordingly, the Incentive Fee will be payable with respect to a fiscal year and with respect to a Member if the annualized return to such Member for such fiscal year equals or exceeds the Hurdle Rate, regardless of the fact that the annualized return to such Member for any prior fiscal year may have been below the Hurdle Rate. Once paid, Incentive Fees are not subject to forfeiture for any reason, even if the annualized return to a Member for a

subsequent year is below the Hurdle Rate. "Incentive Fee Distributions" for purposes of this Agreement means all cash distributions paid by the Company to Members, other than distributions constituting a return of capital. In addition to the amount payable pursuant to this Section, the termination payment payable to the Advisor pursuant to Section 16(a)(iii) hereof shall also be considered part of the Incentive Fee. The Incentive Fee is intended to constitute a profit interest in the Company (within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343 (June 9, 1993) and Revenue Procedure 2001-43, 2001 2 C.B. 191 (August 3, 2001)) and shall be represented by Class P Units issued pursuant to the Company's Operating Agreement.

10.    **Expenses.** (a) In addition to the compensation paid to the Advisor pursuant to Section 9 hereof, and except as provided in Subparagraph (b) or (c) below, the Company shall pay directly or reimburse the Advisor for the following expenses to the extent they are paid by the Advisor and not paid directly by the Company:

    (i)    Organizational and Offering Expenses;

    (ii)    Operating Expenses;

    (iii)    Investment Expenses;

    (iv)    costs associated with insurance required in connection with the business of the Company or by the Advisory Board;

    (v)    expenses of managing and operating Investments owned by the Company, whether payable to an Affiliate of the Advisor or a non-affiliated Person;

    (vi)    fees and expenses of legal counsel for the Company;

    (vii)    fees and expenses of non-affiliated auditors and accountants for the Company;

    (viii)    all expenses in connection with payments to the Advisory Board and meetings of the Advisory Board or the Members;

    (ix)    expenses associated with the issuance of Membership Interests and other securities, such as selling commissions and fees, taxes, legal and accounting fees, listing and registration fees, and other Organizational and Offering Expenses;

    (x)    expenses connected with payments of dividends in cash or otherwise to the Members;

    (xi)    expenses of organizing, revising, amending, converting, modifying or terminating the Company or the Certificate of Formation;

    (xii)    expenses of maintaining communications with Members, including the cost of preparation, printing and mailing of annual reports and other Member reports and other reports required by governmental entities;

(xiii)   expenses related to the properties and Investments and other fees relating to making Investments, including personnel and other costs incurred in transactions where a fee is not payable to the Advisor;

(xiv)   travel expenses incurred in carrying out the business of the Company;

(xv)   expenses, including research and due diligence costs, incurred in connection  with (A) lending to, or investing in, portfolio companies or borrowers, (B) bank, custodian, audit, regulator, legal and accounting fees of the Fund, (C) director fees and reimbursements, including any director liability insurance premiums, (D) indemnification obligations of the Fund, (E) any fees payable to any other investment adviser selected by the Manager; and

(xvi)   all other expenses the Advisor incurs in connection with providing services to the Company.

(b)   No reimbursement is permitted to the Advisor or its Affiliates under clause (a) above for items such as rent, depreciation, utilities, capital equipment, the salaries and fringe benefits incurred with respect to personnel of the Advisor, and other administrative items, except that salaries and related salary expenses for non-supervisory services which could be performed directly for the Company by independent parties, such as legal, accounting transfer agent, data processing and duplication shall be permitted reimbursements to the extent such salaries or expenses do not exceed that which would be charged by independent third parties.

(c)   Notwithstanding anything to the contrary, no reimbursement shall be made to the Advisor to the extent such amounts would exceed those which would be payable to non-affiliated third parties in the same locality for similar products or services.

(d)   Expenses incurred by the Advisor on behalf of the Company and payable pursuant to this Section shall be reimbursed quarterly to the Advisor within 30 days after the end of each quarter.  The Advisor shall prepare a statement documenting the expenses of the Company during each quarter, and shall deliver such statement to the Company after the end of each quarter.

11.   **Other Services**. Each request by the Company or the Advisory Board that the Advisor or any partner or employee thereof render services for the Company other than as set forth herein, shall be separately compensated, provided that such compensation may not exceed reasonable amounts that would be paid to non-affiliated third parties providing the same or similar services.

12.   **Other Activities of the Advisor**. Nothing herein contained shall prevent the Advisor from engaging in other activities, including, without limitation, the rendering of advice to other investors (including other private equity funds) and the management of other programs advised, sponsored or organized by the Advisor or its Affiliates; nor shall this Agreement limit or restrict the right of any director, officer, employee, partner or shareholder of the Advisor or its Affiliates to engage in any other business or to render services of any kind to any other Person. The Advisor may, with respect to any Investment in which the Company is a participant, also render advice and service to the other participants therein. The Advisor shall report to the Advisory

Board the existence of any condition or circumstance, existing or anticipated, of which it has knowledge, which creates or could create a conflict of interest between the Advisor's obligations to the Company and its obligations to or its interest in any other Person.

In the event that the Advisor or its Affiliates are presented with a potential Investment which might be made by the Company and by another investment entity which the Advisor or its Affiliates advise or manage, the Advisor shall consider the investment portfolio of each entity, cash flow of each entity, the effect of the acquisition on the diversification of each entity's portfolio, the estimated income tax effects of the purchase on each entity, the policies of each entity relating to leverage, the funds of each entity available for investment and the length of time such funds have been available for investment and the various ways in which the potential Investment can be structured.

13.     **[Intentionally Omitted]**

14.     **Term; Termination of Agreement**. This Agreement shall continue in full force and effect until the earlier of (i) the date on which the Company is liquidated and all its assets distributed to the Members and (ii) the tenth anniversary of its effective date, unless earlier terminated in accordance with the terms of this Agreement (the "Termination Date"); provided that if the term of existence of the Company is extended in accordance with its Operating Agreement, the Advisor shall have the option of extending the term of this Agreement for a similar period of time.

This Agreement may be terminated at any time (i) by the Advisor with at least 60 days' written notice, (ii) immediately by the Company for Cause, or (iii) immediately by the Advisor for Good Reason. The Advisor shall cooperate with the Company to provide an orderly management transition after any such termination. If this Agreement is terminated by the Advisor as provided herein and the Members shall have failed to appoint a successor investment advisor and managing member within 30 days after such termination, the Advisor shall have the right, at its option, to appoint such a successor, or to petition a court of competent jurisdiction to appoint such a successor.

15.     **Assignment Prohibition**. This Agreement shall not be assigned by either party without the consent of the other, except that the Advisor may assign this Agreement to any corporation or other organization which succeeds to the business and assets of the Advisor by merger or sale of substantially all the assets, in which case such successor organization shall be bound hereunder.

16.     **Payments to and Duties of Advisor Upon Termination**.

(a)     After the Termination Date, the Advisor shall not be entitled to compensation for further services hereunder, except that it shall be entitled to receive from the Company, within 30 days after the Termination Date, the following:

(i)     all unpaid reimbursements of Expenses permissible under Section 11;

-10-

(ii)      all accrued but unpaid Management Fees (pro rated for the period ending on the Termination Date) and Incentive Fees; and

(iii)      a termination payment equal to the Incentive Fee the Advisor would be entitled to receive if the Company's assets were sold for cash at their fair market value as of the Termination Date, and the resulting cash distributed to Members on such date. This termination payment shall be considered to be part of the Advisor's Incentive Fee.

(b)      The Advisor shall promptly upon termination (i) pay over to the Company all money collected and held for the account of the Company pursuant to this Agreement, after deducting any accrued compensation and reimbursement for its expenses to which it is then entitled; (ii) deliver to the Company a full accounting, including a statement showing all payments collected by it and a statement of all money held by it, covering the period following the date of the last accounting furnished to the Company; (iii) deliver to the Company all assets and documents of the Company then in the custody of the Advisor; and (iv) cooperate with the Company to provide an orderly management transition.

17.      **Indemnification by the Company**.  The Company shall indemnify and hold harmless the Advisor and its Affiliates, including their respective officers, directors, partners, shareholders, members, employees, representatives and agents (each, a "Covered Person"), from all liability, claims, damages or losses arising in the performance of their duties hereunder, and related expenses, including reasonable attorneys' fees and investigation expenses, subject to any limitations imposed by the laws of Puerto Rico. Notwithstanding the foregoing, the Advisor shall not be entitled to indemnification or to be held harmless pursuant to this Section for any actions that are determined to involve its bad faith, willful misconduct or gross negligence by a final judgment of a court of competent jurisdiction. Each Covered Person shall also have the indemnification and exculpation rights provided to them under the Company's Operating Agreement.

18.      **Notices**.  Any notice, report or other communication required or permitted to be given hereunder shall be in writing unless some other method of giving such notice, report or other communication is accepted by the party to whom it is given, and shall be given by being delivered by hand or by overnight mail or other overnight delivery service to the addresses set forth herein:

To the Company:

The Phoenix Fund LLC
Villa Caparra
243 PR State Road No. 2
Guaynabo PR 00966
Attn: Edgar J. Rivera, General Counsel

To the Advisor:

The Phoenix Fund Advisor, LLC
Villa Caparra
243 PR State Road No. 2
Guaynabo PR 00966
Attn: Edgar J. Rivera, General Counsel

With a copy to:

ACAPR, LLC
D/B/A Phoenix ACA
1401 Broad Street
Clifton, New Jersey 07013
Attn: Gary Baumann, Manager

Either party may at any time give notice in writing to the other party of a change in its address for the purposes of this Agreement.

19.     **Modification**. This Agreement shall not be changed, modified, terminated, or discharged, in whole or in part, except by an instrument in writing signed by both parties hereto, or their respective successors or assignees. This Agreement may be amended by the Company and the Advisor without the consent of any Member of the Company, and shall be amended to conform to any requirement of any governmental or regulatory authority.

20.     **Severability**. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other provision may be invalid or unenforceable in whole or in part.

21.     **Construction**. The provisions of this Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Puerto Rico.

22.     **Entire Agreement**. This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing.

23.     **Indulgences, Not Waivers**. Neither the failure nor any delay on the part of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24.     **Gender**. Words used herein regardless of the number and gender specifically used shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

25.     **Titles Not to Affect Interpretation**. The titles of sections contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.     **Execution in Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

**IN WITNESS WHEREOF,** the parties hereto have caused their duly authorized representatives to execute this Advisory Agreement as of the day and year first above written.

**THE PHOENIX FUND LLC**

By The Phoenix Fund Advisor LLC,
Its Managing Member

By: _____
Name: Francisco J. Rivera
Title: President

**THE PHOENIX FUND ADVISOR LLC**
**As Investment Adviser**

By: _____
Name: Robert Ambrosi
Title: Chairman of the Advisory Board